******************************************************************

The ''officially released'' date that appears near the beginning of this opinion is the date the opinion was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

This opinion is subject to revisions and editorial changes, not of a substantive nature, and corrections of a technical nature prior to publication in the Connecticut Law Journal.

******************************************************************

## IN RE OMAR I. ET AL.*
## (AC 43251)

Lavine, Keller and Bishop, Js.

*Syllabus*

The respondent father appealed to this court from the judgments of the trial court terminating his parental rights as to the petitioners, his three minor biological children, and denying his motion to revoke their commitment to the custody and care of the Commissioner of Children and Families. The father claimed, inter alia, that the trial court erred in concluding that the children had proved, by clear and convincing evidence, that he failed to achieve a sufficient degree of personal rehabilitation, as required by statute (§ 17a-112 (j) (3) (B) (i)), that would encourage the belief that, within a reasonable time, he could assume a responsible position in their lives. Court-appointed attorneys for the children had filed petitions to terminate the parental rights of the father and the children's biological mother after the children had been adjudicated neglected in a prior proceeding and committed to the custody of the commissioner. The trial court, which also terminated the mother's parental rights, found that the children had proved, by clear and convincing evidence, that the Department of Children and Families had made reasonable efforts to reunify them with the father but that he had attempted to manipulate and control some of the service providers offered to him by the department, and engaged in coercive and controlling behavior that led to the failure of the parenting services that had been provided to the parents. The court also found that the parents could not adequately meet the children's developmental, emotional and medical needs, that the parents had not acquired the ability to care for the children, had failed to meet some of their basic needs and failed to ensure their school attendance. The court further found that there was a pattern of intimate personal violence between the parents in the presence of the children and that, in the four years since the children had been removed from the family home and later placed in foster care, the father consistently maintained that he had done nothing wrong and failed to gain insight into his controlling behavior and how it impacted the children. *Held*:

1. The respondent father could not prevail on his unpreserved claim that judicial bias deprived him of a fair trial, as he failed to demonstrate the existence of plain error: the father's disagreements as to several of the court's adverse rulings and factual findings were not a proper basis for a claim of judicial bias and did not constitute evidence of judicial bias, as those rulings and findings were plainly based on facts in evidence and were relevant to the issues before the court, the father's complaint that the court relitigated the prior finding of neglect erroneously conflated that finding with the court's assessment of evidence in the neglect proceeding, the court having been unable to relitigate the finding of neglect, and the father did not cite any authority that supported his belief that the court in a subsequent termination of parental rights trial may not independently assess evidence from the prior neglect proceeding in evaluating whether rehabilitation, which is factually and legally distinct from neglect, had occurred, and, even if the court had confined its analysis to his conduct beginning at the time of the children's commitment to the commissioner, the father could not demonstrate that there would have been a different outcome in the termination of parental rights proceeding; moreover, there was no basis in the record to support the father's argument that the court precluded him from calling several witnesses to testify, as he did not cite to any instance in which the persons he identified in his brief were precluded from testifying, those persons either testified or their opinion was before the court, which considered their testimony in its evaluation of the evidence, and the father failed to show that the court's weighing of the evidence in the manner that it did reflected judicial bias, as the court's written decision explained its factual findings and why it discounted the weight of certain evidence and afforded greater weight to other testimony

and evidence.

2. The respondent father could not prevail on his claim that the trial court improperly found that there was clear and convincing evidence that he failed to rehabilitate himself, which was based on his assertion that the court misconstrued the proper legal standard and the principle of "coercive control": the court's finding that he failed to achieve sufficient rehabilitation was supported by the evidence and the reasonable inferences that could be drawn therefrom, which included the court's observation that he had not recognized his role in the children's removal from the home, he continued his pattern of exerting control concerning the mother and undermining efforts to reunify her and the children while failing to recognize how those failures impacted the children, and he had not gained the ability to set aside his personal interests and demonstrate an ability to provide a safe, nurturing and stable home environment for the children; moreover, contrary to the father's assertion that the court failed to limit its inquiry to whether he satisfied the specific steps that he was issued, pursuant to § 17a-112 (j) (3) (B), to facilitate his reunification with the children, a determination with respect to rehabilitation is not solely dependent on compliance with the specific steps but with whether the facts that led to the initial commitment of the children to the commissioner have been corrected, his claim that the court improperly considered his conduct from the time the children were removed from the family home instead of from the time they were committed to the commissioner's custody two years later was not logically sound and lacked legal support, as he was on notice of the issues that led to the children's removal and could have taken steps to address the issues, and he could not demonstrate that the court misconstrued the meaning of coercive control, which he based on his claim that, after he was issued the specific steps, there was no evidence that he intimidated, threatened or induced fear in the mother, as coercive control is a factual description of conduct and not a term of art for which a legal definition exists.

3. This court found unpersuasive the respondent father's claim that the trial court improperly determined that the termination of his parental rights was in the children's best interests, which was based on his assertion that the court disregarded the children's Muslim religious affiliation: the father's assertion that the court deemed the children's religious affiliation insignificant was belied by the court's written decision, in which the court observed that, although the father identified as a Muslim, the length of his visits with the children had been extended to permit him to engage in religious instruction with them and the department had transported the children, at his request, to a mosque for religious instruction, he had not made any significant efforts to foster religious beliefs in the children or engaged in prayer with them, and the children, who had expressed anxiety about their religious identities, had not attended religious services prior to their removal from the family home; moreover, the court properly considered the religious beliefs of the children, if any, and those of the mother, who, although she had been a practicing Muslim, had expressed her desire to introduce the children to other religious practices, and the father's assertion that the trial court's best interests finding should be overturned, which was based on his claim that the children had been placed with foster parents who did not foster the Muslim faith and had introduced them to religious beliefs that differed from his Muslim beliefs, reflected a misunderstanding of the court's inquiry in the dispositional phase of a termination of parental rights proceeding, and, even if there were a legal requirement that the children be placed in a setting that would nurture their religious faith or that of the father, he failed to demonstrate how the failure to comply with such a requirement was a basis on which to challenge the court's determination that the children's best interests were served by terminating his parental rights.

4. The respondent father's claim that the trial court improperly found that the department made reasonable efforts to reunify him with the children was unavailing: contrary to the father's assertions that the department unreasonably prolonged the children's stay in foster care for more than four years and failed to achieve permanency for them, the department took steps to ensure that they achieved a sense of permanency in that, since the time of their removal from the family home, they resided with one another and were cared for by their foster parents, with whom they bonded and who provided a living environment that met their physical

and emotional needs, and, in light of the difficulties the father posed in participating in the services the department offered him and his failure to provide adequate supervision during visitation with the children, it was disingenuous for him to blame the department for the fact that the children were in foster care for a lengthy period of time; moreover, the department's placement of the children with a foster family that was not of the Muslim faith did not undermine the court's reasonable efforts finding, as the father was afforded ample opportunity to engage the children in matters of faith, which he failed to do, and a rational interpretation of the applicable statute (§ 17a-96) did not require the department to place the children with foster parents who would foster the Muslim faith in them.

5. This court declined to review the respondent father's unpreserved claim that the department was estopped from supporting the children's petitions to terminate his parental rights; although the department initially recommended that reunification efforts continue but thereafter changed its position by the time of trial and adopted the children's petitions for termination of the father's parental rights, there was no trial court ruling on this issue to review, the father did not provide this court with any legal basis on which to review his claim and, as a result of his failure to raise the issue at trial, there was no evidence to review with respect to why the department changed its position or whether the father changed his conduct in reliance on the department's change of position.

6. The respondent father's claim that the trial court improperly denied his motion to revoke the commitment of the children to the care and custody of the commissioner was unavailing; the father's assertion that the cause underlying the children's commitment, parental conflict, no longer existed was contrary to the court's findings, which were supported by the evidence and the rational inferences to be drawn from them.

Argued January 16—officially released May 27, 2020**

*Procedural History*

Petitions by the Commissioner of Children and Families to adjudicate the respondents' three minor children neglected, brought to the Superior Court in the judicial district of New Britain and tried to the court, *Lobo, J.*; judgments adjudicating the minor children neglected and committing them to the custody of the Commissioner of Children and Families; thereafter, petitions by the three minor children to terminate the respondent parents' parental rights, brought to the Superior Court in the judicial district of Middlesex, Child Protection Session, and tried to the court, *Burgdorff, J.*; subsequently, the court, *Burgdorff, J.*, denied the respondents' motions to revoke the court's order committing the minor children to the custody of the Commissioner of Children and Families and rendered judgments terminating the respondents' parental rights, from which the respondent father appealed to this court. *Affirmed.*

*Ammar A. I.*, self-represented, the appellant (respondent father).

*Brian T. Walsh*, assigned counsel, with whom, on the brief, were *Robert W. Lewonka*, assigned counsel, and *Katarzyna Maluszewski*, assigned counsel, for the appellees (petitioners).

*Carolyn A. Signorelli*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and *Benjamin Zivyon* and *Jane Rosenberg*, assistant attorneys general, for the appellee (Commissioner of Children and Families).

*Opinion*

KELLER, J. The self-represented respondent father, Ammar A. I.[1] appeals from the judgments of the trial court terminating his parental rights pursuant to General Statutes § 17a-112 (j) (3) (B) (i) as to three of his biological minor children, the petitioners, Omar, Safiyah, and Muneer (children), and denying his motion to revoke the court's order committing the children to the care, custody, and guardianship of the Commissioner of Children and Families (commissioner). The respondent claims that (1) judicial bias deprived him of a fair trial, (2) the court improperly found that he failed to achieve such a degree of personal rehabilitation as would encourage the belief that, within a reasonable period of time, considering the ages and needs of the children, he could assume a responsible position in the children's lives, (3) the court improperly found that the termination of his parental rights was in the children's best interests, (4) the court improperly found that the Department of Children and Families (department) made reasonable efforts to reunify him with his children, (5) the department was estopped from supporting the petitions brought by the children to terminate his parental rights, and (6) the court improperly denied his motion to revoke the court's order that committed the children to the care and custody of the commissioner.[2] We affirm the judgments of the trial court.

The following facts and procedural history are not in dispute. The respondent is the biological father of the three children at issue in this appeal. The respondent and the children's biological mother married in May, 2005, and separated in 2015. The respondent is also the biological father of three sons who were born prior to the respondent's relationship with and marriage to the mother. On December 18, 2017, Omar, Safiyah, and Muneer were adjudicated neglected by the court, *Lobo*, *J.*, and committed to the care and custody of the commissioner. The court, *Lobo*, *J.*, ordered specific steps, pursuant to § 17a-112 (j) (3) (B), for the respondent and the mother to take to facilitate the return of the children to them.[3] Thereafter, the department made efforts to reunify the children with the respondent and the mother.

In November, 2018, attorneys representing the children[4] filed petitions to terminate the parental rights of the respondent and the mother pursuant to § 17a-112 (j) (3) (B) (i)[5] on the grounds that the children had been adjudicated neglected in a prior proceeding and that the respondent and the mother, who had been provided specific steps to facilitate reunification, had failed to achieve such a degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the ages and needs of the children, they could assume a responsible position in the lives of the children. The court, *Burgdorff*, *J.*, conducted

a trial on the petitions over the course of fifteen days between January and April, 2019. Although the commissioner did not initially support the position of the children, she did so by the time of trial. On July 26, 2019, the court issued a thorough memorandum of decision in which it terminated the parental rights of the respondent and the mother and denied the parents' motions to revoke the order committing the children to the care and custody of the commissioner.[6] This appeal by the respondent followed.[7]

I

TRIAL COURT'S MEMORANDUM OF DECISION[8]

A

Relevant Procedural History

In its well reasoned and thorough memorandum of decision, the court set forth the following procedural history: "This family first became involved with [the department] in 2011 due to issues of physical and emotional neglect. A report was made to [the department] concerning [the] mother's concerns that Safiyah had a rash in her vaginal area, which [the] mother felt was related to [the respondent's] older son, Oais, having [had] inappropriate sexual contact with her, as observed by [the] mother. No trauma was noted by Safiyah's physician, and the allegation was unsubstantiated. On February 11, 2012, [the department] received an anonymous report from [the respondent's] oldest child, Adnan, that [the] mother was suffering from schizophrenia and that she had accused him of making sexual advances against her. . . . The allegations were unsubstantiated. On April 12, 2012, [the department] received a referral from St. Vincent's Behavioral Health reporting that Adnan had been admitted to the hospital on March 30, 2012. Adnan was diagnosed with mood disorder, anxiety, post-traumatic stress disorder and polysubstance abuse. Adnan admitted to a suicide attempt when jumping out of a car [the respondent] was operating en route to the police station to report Adnan's stealing. . . . [The respondent] and [the] mother refused to take him home from the hospital. The allegations of physical neglect were substantiated, and Adnan was adjudicated neglected and removed from [the respondent's] care on April 20, 2012. He was committed to [the department] until his eighteenth birthday. On April 9, 2015, [the] mother contacted the Plymouth Police Department to report her concern that [the respondent] had allowed Oais in the family home and reported that he had a history of sexually inappropriate behavior with Safiyah, and that [the respondent] had directed [the] mother to lie to [the department] about what she had witnessed. On May 16, 2015, [the respondent] reported to [the department] that [the] mother was diagnosed with mental health issues, including manic depression and anxiety, and was pre-

scribed with many medications that she left around the house, which [the] mother denied. The allegations by [the respondent] were unsubstantiated.

"After [the] mother and [the respondent] separated in May, 2015, [the respondent] moved out the family home. On July 29, 2015, [the respondent] filed [a motion for] an emergency ex parte order of temporary custody along with a sworn affidavit with the Superior Court for family matters in New Britain . . . . [The respondent] reported [that] he filed the motion for [an] ex parte order of custody with the expectation that he would be awarded immediate custody of the children. The court, *Abery-Wetstone, J.*, issued a bench order of temporary custody removing the children from [their] parents' care, and vested their care and custody with [the commissioner] based on the allegations contained in [the respondent's] affidavit. The [order of temporary custody] was sustained on August 7, 2015, [by the court, *Frazzini, J.*].

"Thereafter, on the evening of July 29, 2015, and after the issuance of the [order of temporary custody], the Plymouth Police Department contacted the [department's] Careline to report that [the] mother [had] reported that [the respondent had] texted her, stating that he was outside of the home and demanded to be let in; that [the respondent] had previously texted [the] mother threatening messages stating that he had hidden in the garage on a prior occasion to watch for [the] mother's boyfriend, and that, if he found an intruder in his home, he had the right under the law to kill any home invader who enters the home. [The] [m]other reported that she texted [the respondent] to tell him [that] he did not have permission to enter the home and to leave. [The respondent] then entered the home against her wishes. [The] [m]other reported that, upon hearing [the respondent] in the home, she locked the children in the bathroom and she locked herself in a bedroom; that [the respondent] forced himself into the bedroom; that [the] mother was struck by [the respondent] on the arm and was struck in the head with a glass bottle resulting in a cut to her head. When the police arrived at the home, they observed [the] mother bleeding, with a cut approximately one inch [in length] over her right eye. [The respondent] admitted to going in the locked family home and entering the home with the garage door opener against [the] mother's wishes and that he refused to leave when [the] mother requested him to do so. [The] mother reported that the children did not witness the violence. However, the children reported to the police [that] they heard [the] mother and [the respondent] arguing, witnessed [the] mother bleeding after the assault, and saw her being transported from the home by ambulance. [The] [m]other reported to the police that 'she has been subjected to physical and mental abuse from [the respondent] throughout the course of the marriage.' [The

respondent] denied assaulting [the] mother and stated that she self-inflicted her injuries. [The respondent] was arrested on July 30, 2015, and charged with [assault in the second degree, reckless endangerment in the second degree, disorderly conduct, burglary in the third degree, and three counts of risk of injury to a child]. The investigating detective testified during the neglect trial that [the] mother's financial situation would be potentially compromised if [the respondent] was charged. [The] [m]other chose not to cooperate with the police. The charges against [the respondent] were subsequently dismissed.

"[The respondent] later contacted the Plymouth Police Department on at least three occasions requesting that [the] mother be charged [with] filing a false report and three counts of risk of injury [to a child] regarding the July 29, 2015 domestic violence incident. The investigating detective found no probable cause for either charge after reviewing forty thousand texts from [the] mother's and [the respondent's] cell phones, which were given to the detective by [the respondent].

"[The] [m]other also had a protective order on behalf of herself and the children against [the respondent] as the result of the domestic violence incident. The protective order was subsequently modified to allow [the respondent] supervised visitation and ended in October, 2015. The three children were removed from the home on July 29, 2015, and have been in their current foster home since July 31, 2015. . . . [N]eglect petitions were subsequently filed on August 7, 2015, by [the commissioner], alleging that the children were being permitted to live under condition[s], circumstances or associations injurious to their well-being, due to their exposure to domestic violence between the parents, and educational neglect. [The department] reported that during the 2014–2015 school year, Omar was absent twenty-one days and tardy eighteen times, Safiyah was absent eighteen times and tardy twenty-three times, and Muneer was absent forty times and tardy nine times. Further, all three children had bed-wetting issues when placed in their current foster home. All three were wearing diapers and did not know basic hygiene. All three children required a high level of supervision and had special needs. All three children also exhibited inappropriate sexual behavior in the foster home. After a mistrial, the children were adjudicated neglected by the court (*Lobo, J.*) in a bench decision of December 18, 2017, and committed to the care and custody of the [commissioner]. [The commissioner] filed permanency plans seeking reunification of the children with placement with [the] mother under a period of protective supervision. In November, 2018, the minor children . . . filed petitions for termination of [the] mother's and [the respondent's] parental rights. [The] petitions were subsequently adopted and supported by [the com-

missioner] at the time of trial."

## B

### Mother

The court made findings with respect to [the] mother, which we set forth in large part because they are integral to an understanding of the court's findings with respect to the respondent and the living conditions to which the children were exposed while in the care of their biological parents.

"[The] [m]other reported that she was eighteen years old when she met [the respondent] on a computer website when researching Islamic culture due to her interest in converting to Islam. They commenced an online relationship. Within two weeks of commencing that relationship, [the respondent] flew [the] mother to Connecticut. They married shortly thereafter on May 6, 2005, because Islamic law prohibited cohabitating before marriage. . . .

"[The] [m]other was completely dependent on [the respondent] financially throughout the marriage. At [the] time the children were removed, [the] mother reported that she had less than $100. Her work history has consisted [of] helping out [the respondent] in his dental practice . . . .

"[The] [m]other engaged in an extramarital affair with 'George' prior to the removal of the children from the home and prior to her separation from [the respondent]. [The] [m]other exchanged explicitly graphic sexual photos with George. [The respondent] saw the photographs when he took [the] mother's cell phone from her without permission. As noted [herein], [the] mother and [the respondent] had three children, Omar, Safiyah, and Muneer. At the time of their marriage, [the respondent] had three older sons: Adnan . . . Muhammed . . . and Oais . . . . [The] [m]other reported that [the respondent] informed her that Oais' and Muhammed's mother severely abused Adnan, a child from his first marriage, and that [the respondent] divorced her but allowed Oais and Muhammed to remain in her custody. [The] [m]other reported that Adnan returned to his mother's care in Syria. Adnan returned to reside in the family home when he was approximately thirteen years old. For a period of time, all three of [the respondent's] older children lived in the home, along with the three younger children, Omar, Safiyah, and Muneer. Due to [the] mother's becoming overwhelmed with raising six children, a series of nannies and babysitters was hired to assist her. [The] [m]other left most of the child-rearing to the nannies.

"After separating from [the respondent] and after the children's removal, [the] mother eventually moved out of the leased family home and relocated to Norwich in November, 2015, where she rents a three bedroom apartment. . . . She testified during [the] trial that she

found employment but had not yet commenced working. . . .

"[The] [m]other . . . reported that she had a trust fund containing approximately \$130,000 to \$180,000 at the time of her marriage. She gave those funds to [the respondent] to open up his own dental practice. [The respondent] agreed to pay her back but [she] said [the] agreement was never formalized, and it has not been paid back. Since [the] mother's and [the respondent's] divorce, [the] mother has received additional financial assistance from [the respondent], in addition to . . . alimony payments, including the purchase of a motor vehicle. [The] [m]other testified that if the court terminated [the respondent's] parental rights, she would continue to seek financial assistance from [the respondent] to assist her in caring for the children if they were returned to her care.

"[The] [m]other reported observing inappropriate sexual touching of Safiyah and Muneer by Oais in 2012. [The] [m]other expressed her concerns to [the respondent] as to the sexual contact. [The respondent] repeatedly expressed denial of any sexual misconduct by Oais and threatened [the] mother not to report it. . . .

"[The] [m]other reported that Omar, Safiyah, and Muneer were exposed to a video recording of [the] mother and [the respondent] engaging in sexual acts that was filmed by [the respondent]. [The] [m]other reported that she consented to being in the videos with [the respondent] but that [the respondent] allowed the video to be streamed to other devices in the home, which the children inadvertently saw. [The respondent] admitted to filming the sexual activity but blamed [the] mother for [its] being seen by the children.

"[The] [m]other and [the respondent] divorced on August 15, 2016 (*Carbonneau, J.*). The court ordered that all issues regarding the children were referred to the juvenile court in light of the issuance of the [order of temporary custody] and pending neglect petitions.

"[The] [m]other reported that [the respondent] exhibited controlling, abusive and possessive behavior toward her throughout the marriage. She also reported ongoing domestic violence and coercive control by [the respondent]. [The] [m]other reported that [the respondent] would control her financially by refusing to let her work outside of the home, limit[ing] the use of her motor vehicle, and [taking] her cell phone. He also threatened to take the children out of the country and threatened that she would never see them again. [The] [m]other also reported that [the respondent] took the family out for a 'last supper' on July 27, 2015, at which time he confronted [the] mother about her affair, all in the presence of her children. He also began swearing at her and degrading her in front of the children while driving the car, and . . . drove in an erratic manner

and sped through red lights.

"[The] [m]other denied the allegations made by [the respondent] in his [previously] referenced affidavit to the family court on July 29, 2015. She also reported that, on the evening of July 29, 2015, as also discussed [previously], [the respondent] texted [the] mother regarding breaking into the family home, that he would be waiting in the garage with a gun to shoot her lover, that he had a knife and would kill her lover, that she told [the respondent] to leave the home, and [that] they engaged in a physical struggle at which time [the respondent] struck her in the face with a glass oil diffuser. . . . [The] [m]other stated that she did not want to pursue the criminal charges against [the respondent] because she would be without any financial support if he were incarcerated. . . .

"[The] [m]other was also referred to a Women and Healing Group at [the] Wheeler Clinic to address her domestic violence issues in her relationship with [the respondent]. [The] [m]other has engaged in group therapy since August 10, 2015. [The] [m]other's therapist noted that [the] mother's presentation was consistent with a victim of domestic violence. . . .

"Prior to [the department's] involvement, [the] mother was engaged in individual treatment and therapy at Bristol Psychiatric Services commencing in October, 2011, until November, 2014. She reengaged in services . . . on March 11, 2015, and then reengaged in services with her prior therapist in December, 2015. [The] [m]other's therapist diagnosed her with post-traumatic stress disorder, attention deficit hyperactivity disorder, and panic disorder. . . . Her therapist also reported that [the] mother was experiencing ongoing stress regarding her divorce from [the respondent] and the accusations he made against her. [The] [m]other's goals were to focus on her relationship and coparenting with [the respondent], and how the relationship impacted the children. . . . The therapist also noted that [the] mother worked on the conflict issues with [the respondent] but also acknowledged her deep fear of [the respondent] and his continued controlling behaviors. [The] [m]other also acknowledged [that] her fear of [the respondent] could impact their ability to coparent the children. . . . [The] [m]other continued therapy until June, 2018, when her therapist moved out of state. Currently, [the] mother is not engaged in individual therapy, nor has she sought out a new therapist since that time.

"[The] [m]other participated in family therapy with the children and their therapists, Michael DeRosa and Kristin Baker, commencing in July, 2018. [The respondent] did not participate along with [the] mother, as the therapists felt that [the respondent] was not 'grounded enough to make progress in family therapy' with the children. . . .

"[The] [m]other underwent a court-ordered psychological evaluation with Dr. Stephen Humphrey, a licensed clinical psychologist, commencing in October, 2015. Dr. Humphrey completed psychological evaluations of [the] mother, [the respondent], and interactionals with the three children. He also completed updated psychological evaluations and interactionals in 2018.

"After the initial evaluation, Dr. Humphrey reported that [the respondent] stated that [the] mother was suicidal; however, Dr. Humphrey found no indication of that from her interview with him or from her demeanor, nor did she present with any obvious mental disorder. He also found no support of a substance abuse disorder, also contrary to [the respondent's] claims. He recommended that [the] mother continue with her therapy and support groups.

"Dr. Humphrey opined in his initial report that [the children] . . . had been 'living in a conflict-laden home environment that has included allegations of intimate partner violence, educational neglect, and counterclaims of parental inadequacy and neglect . . . and . . . the parents' relationship is likely to remain contentious.' Dr. Humphrey noted that he could not 'emphasize enough how psychologically toxic this conflict between parents is for young children.' He also opined that the children should be engaged in 'individual supportive psychotherapy to address the likely effects of past exposure to interfamilial strife and conflict, and moderate the effects of any future conflict.' . . .

"In his updated evaluation in March and April, 2018, Dr. Humphrey reiterated that [the] mother needed continued services to help her 'to understand the nature and history (including any contributions of trauma and psychosexual variables) of her engagement with men who (by her report) place her at risk for victimization and coercive control . . . . He further noted that he 'was concerned about the degree of dependence [the mother] showed [the respondent] . . . given his proclivity toward behaviors that are intrusive and controlling' and that she could continue therapy that will 'ideally help [the mother] to avoid emotional or other forms of dependence on [the respondent], and to develop positive, healthy and supportive relationships with others.' . . . [With regard to the children's developmental delays, the mother's recognition of these delays] 'falls far short of recognizing how delayed [the children] were, and does not incorporate an acknowledgement of how much school the children were missing in her care.'

"Notably, [the] mother has never engaged in the psychosexual therapy recommended by Dr. Humphrey. Further, Dr. Humphrey recommended coparenting sessions for [the] mother and [the respondent]. As discussed below, they did not begin those services until

. . . approximately three years after the recommendation by Dr. Humphrey, and the initial services were unsuccessful.

"Pursuant to the court-ordered specific steps and Dr. Humphrey's recommendation, [the] mother and [the respondent] participated in coparenting services with Attorney Emily Moskowitz commencing in January, 2018. Notably, [the respondent] unilaterally provided Attorney Moskowitz with the police reports regarding the July 29, 2015 domestic violence incident at his first session with her, although Attorney Moskowitz testified that she did not review them. Initially, [the] mother was reported by Attorney Moskowitz to be making progress. [The] [m]other reported that she and [the respondent] were making progress, as did [the respondent]; however, [the] mother did not feel respected by Attorney Moskowitz in the sessions and felt [that] Attorney Moskowitz 'had the understanding that [the respondent] was good to me and I fabricated everything. . . .' [The] [m]other also reported that during the first coparenting session with [the respondent], [the respondent] stated that the foster parents were 'poisoning the kids with Christianity.' It was also reported that [the respondent] complained about the foster parents . . . alienating the children from [him]. [The respondent] also falsely reported to Attorney Moskowitz that [the] mother was not seeking custody of the children and that she was unfit to parent the children. [The] [m]other discontinued the services with Attorney Moskowitz due to her impression that her concerns were not being adequately heard. [The] [m]other also reported that the reports being made to [the department] by Attorney Moskowitz did not accurately reflect what occurred during the sessions. When [the] mother requested permission to tape the sessions, she was refused, at which time the sessions ceased. [The] [m]other credibly testified that Attorney Moskowitz took [the respondent's] side and accepted [the respondent's] misrepresentation that the children were being returned to his care. The court finds [the] mother's concerns well-founded based on the credible evidence presented. The court found Attorney Moskowitz to be clearly biased against [the] mother in her reports to [the department] and during her testimony, primarily due to [the respondent's] attempts to control and influence the sessions. [The] [m]other and [the respondent] engaged with another parenting coordinator, Rabbi [Andrew P. Hechtman], during the pendency of the [termination of parental rights] trial, as discussed in further detail . . . .

"The children have consistently reported enjoying their visits with [the] mother; however, they have also consistently maintained that they wish to remain in their foster home. It was observed that [the] mother was having difficulty, at times, in handling the children and keeping track of their appointments and required assistance from [the department]. [The] [m]other has

also developed a good relationship with the foster parents."

## C

### Respondent

The court made the following findings concerning the respondent: "[The respondent] . . . was born on September 16, [1966], in Saudi Arabia. He received his early education in Saudi Arabia and emigrated to the United States in 1989 to further his education. He attended the University of Connecticut, where he received his dental degree, and Tufts University, where he received a certificate in special pediatric dentistry. [The respondent] has owned his own dental practice since 2007. He also works as a pediatric dental surgeon at Connecticut Children's Medical Center. [The respondent] was issued a $10,000 fine and three years of probation in September, 2018, following concerns of unnecessary dental practices. [The respondent] denies any wrongdoing. [The respondent] is reportedly in good health.

"[The respondent's] criminal history involves an arrest on July 29, 2015, stemming from the domestic violence incident involving [the] mother at the family home as discussed in detail [previously]. [The respondent] admitted he went to the home and that he entered with the garage door opener because the doors were locked; that [the] mother asked him not to enter the home but he did so anyway, and he admitted to sending [the] mother text messages of a threatening nature, including that he would enter the home with a knife. [The respondent] admitted to engaging in an argument with [the] mother upon entering the home but denied that it was confrontational or that there was a physical altercation. He reported that [the] mother self-inflicted the injuries she sustained during the altercation. He reported that he was arrested the next day, and a protective order was issued against him on behalf of [the] mother and the children. He was charged with [assault in the second degree, reckless endangerment in the second degree, disorderly conduct, burglary in the third degree, and three counts of risk of injury to a child]. [The respondent] was placed on [the department's] central registry but his name was subsequently removed. He also expressed that his placement on [the department's] central registry has threatened his ability to maintain his [dental] license. The criminal charges were dismissed on September 28, 2016. . . . [The respondent] contacted the police department the day after the incident at the family home and requested that [the] mother be charged with three counts of risk of injury [to a child]. [The] charges were not filed, as no probable cause was found. [The respondent] has filed numerous motions against [the] mother in the family court, including a motion for contempt/sanctions for perjury on March 6, 2016; [a] motion to open [the dissolution]

judgment based on fraud on October 29, 2018, wherein he alleged [fraud on the part of the] mother and her attorney with regard to the divorce decree; [and an] objection to [the] plaintiff's objection to [the] father's motion to open based on fraud on October 29, 2018, which is currently pending.[9] In addition, [the respondent] filed a $9,000,000 civil action for damages against [the] mother related to the July 29, 2015 domestic violence incident. In the juvenile court, [the respondent] has filed at least nine motions directed at [the department] and the foster parents.

"[The respondent] has been married three times. He was married to his first wife in 1993. The marriage ended after the birth of his first child, Adnan, in 1995. [The respondent] reported that Adnan's mother abandoned Adnan. In 1997, he married his second wife. That marriage produced two sons, Muhammed and Oais. That marriage lasted seven years. [The respondent] reported to his psychologist that he threatened to expose Oais' and Muhammed's mother's violence toward the children if she did not give him custody of Muhammed and Oais. [The respondent] also reported that his second wife abused Adnan physically. 'She forced him to eat, poured hot water on him, strangled [him], and kicked him.' [The respondent] reported that he felt guilty for being 'oblivious to what was going on with Adnan.'

"As discussed [previously in the recitation of facts concerning [the] mother, the respondent] married [the] mother in 2005, when [the] mother was eighteen years old and [the respondent] was thirty-eight years old. They married three weeks after they first encountered one another on the Internet. At the time of the marriage, [the respondent's] two older sons, Muhammed and Oais, were living in his home, and [the] mother reported that she helped raise them. The [children] . . . were born of that marriage. . . .

"[The] [m]other and [the respondent] separated in May, 2015. On May 15, 2015, [the respondent] was served with the divorce paperwork. On May 16, 2015, [the respondent] called [the department's] hotline to report alleged neglect of the children by [the] mother. The marriage dissolved by way of divorce in August, 2016. [The respondent] subsequently reported to [the department] that he was engaged to a woman who resided in Arizona and . . . would be residing with him in his home. [The respondent] refused to disclose her name and address to [the department]. He later reported that he is no longer engaged to her.

"[The respondent] currently resides in a home with his adult sons, Oais and Muhammed. Of note, contrary to his court-ordered specific steps, [the respondent] failed to inform [the department] of Oais' and Muhammed's presence in the home when supervised visits in the home with [the children] . . . commenced.

"[The respondent] has consistently and repeatedly denied any physical violence against [the] mother and [has maintained] that the injuries sustained by [the] mother were self-inflicted. However, [the respondent] testified at trial that he shoved or pushed [the] mother away on at least one occasion. He also admitted to taking [the] mother's car and cell phone without her permission after she commenced the divorce proceedings. He attributed the allegations of domestic violence made by [the] mother due to [the] mother's affair with her boyfriend. [The respondent] hired a private detective to [perform] an extensive background check on [the] mother's boyfriend and . . . the investigator followed [the] mother. As discussed [previously], the court finds that the credible evidence presented in this matter confirms [the] mother's account of what transpired at the family home on July 29, 2015.

"Pursuant to his court-ordered specific steps, [the respondent] was ordered by the court to engage in mental health services and focus on the patterns of intimate partner violence, coparenting and dispute resolution.

"[The respondent] underwent a court-ordered psychological evaluation with [Dr. Humphrey] in October, 2015, including interactionals with the children. Dr. Humphrey also performed supplemental evaluations in 2018. Dr. Humphrey conducted the personality assessment inventory with [the respondent] and found it to be of questionable validity in that [the respondent] 'responded in a manner to portray himself to be relatively free of common shortcomings to which most individuals admit.' He did not find any evidence of mental illness but noted that [the respondent] exhibited some grandiosity and the desire to maintain strict control in relationships. He reported that [the respondent] did not believe he would benefit from any therapeutic interventions. He opined that the marriage between [the] mother and [the respondent] 'was marked by indicators of coercive control on the part of [the respondent] ' and was a highly conflictual relationship. He also noted that [the respondent] denied any problems of a psychological nature, including depression. Notably, during his credible testimony, Dr. Humphrey reported that there were issues of intimate partner violence and power control in the relationship, and that the texts between [the] mother and [the respondent] reinforced [the] mother's position that [the respondent] was trying to control her behaviors via threats of violence and coming into the home. He also opined that the fact that the charges against [the respondent] were dismissed did not change his opinion that there was a larger pattern of control. He noted that [the respondent's] entering the family home against [the] mother's wishes was concerning and that the coparenting with [the] mother would be an ongoing issue.

"Dr. Humphrey noted that [the respondent] reported a limited role in the direct day-to-day care of the children when they were in his care, that [the mother] was tasked with taking care of the children with the aid of nannies and babysitters, that [the respondent] was unaware of the children's absences from school and tardiness, and that [the respondent] stated that making sure the children got to school was [the] mother's 'job.' After the initial evaluation, Dr. Humphrey opined that the children should remain in their current foster home until [the] mother and [the respondent] engage in services with a one year period of protective supervision; thereafter, and if [the] mother and [the respondent] followed his recommendations, he would support reunification of the children, with each parent to follow a shared parenting agreement. He recommended [that the respondent's] visitation with the children increase to two hours a week, and if [the respondent] established and engaged in the recommended services, he should have three hours of unsupervised visits one day each weekend. Dr. Humphrey also recommended that the children have no contact with their older [half siblings] unless it occurred during their therapy. He also recommended that [the] mother and [the respondent] engage a parenting coordinator to facilitate effective communication between [the] mother and [the respondent], resolve parenting disputes, and help the parents to understand assessments of the children. He further recommended that the majority of the communication should occur in the presence of the parenting coordinator or through monitored e-mails. Notably, Dr. Humphrey opined that 'the parental psychopathology is not the heart of the problem but, rather, the intense parental conflict that is of concern.' He also noted that a thorough psychological (custody) evaluation was 'essential' if the family court litigation proceeded.

"Dr. Humphrey recommended individual therapy for [the respondent] with specific goals and objectives with the primary goal of focusing on and addressing his coercive and controlling behaviors, in addition to improving his coparenting skills. He also noted that the children appeared comfortable with [the respondent] during the interactionals in 2015 and that he had a positive relationship with them.

"During Dr. Humphrey's testimony [at] the neglect trial on October 19, 2017, Dr. Humphrey discussed a tape recording made by [the respondent] of his conversation with Omar during a supervised visit, wherein [the respondent] was asking Omar which parent was nicer. Dr. Humphrey testified that he found this was concerning because: '[T]here's a great pressure on Omar to decide how to answer the question in a way that would please a parent . . . and then in several ways in the recordings, he urges Omar to answer the question in a way that he wants to hear it answered.

The answers tend to be favorable to [the respondent] and unfavorable to [the mother].' In addition, with regard to the other recordings made by [the respondent] during the visits with the children wherein the visitation supervisor instructed [the respondent] not to ask the children questions about attending church with their foster family, Dr. Humphrey opined that 'the impact of exposing the children to this kind of discord, intention, the tenseness in the voices, and the persistence of asking the same questions in a somewhat insistent way, I am concerned it shows at least some lack of regard for the effect of those things on the children . . . . [T]he concerns for the recordings to me aren't about necessarily control and coercion, although there's an element there. There's an element of persistence to pressure a situation to get the result you want regardless of . . . the consequences . . . [and] the appreciation for the ways in which these things affect the children psychologically, exposure to this level of conflict, exposure to a comparison of [the] mother and [the respondent], casting one as good and the other [as] bad, and exposure to conflict with adults, bringing the children into the conflict . . . .'

"Dr. Humphrey also noted at that time that he was 'less optimistic that there can be a prompt resolution to the matter if the parents . . . have not engaged to this point in the efforts I recommended at working on coparenting issues. . . .' He further noted that 'it was less likely that [the] mother and [the respondent] would be able to overcome [the] conflict that marked their relationship. . . . I don't know whether any efforts [at] psychotherapeutic intervention are going to yield any increased degree of insight or awareness of child protection concerns . . . .'

"With regard to the domestic violence incident of July 29, 2015, Dr. Humphrey noted in his report that his primary concern . . . was [the respondent's] disregard of [the] mother's request that he not enter the home, 'which came after he had made threats of violence in [a] series of text messages.' During his testimony at the neglect trial on October 19, 2017, Dr. Humphrey noted that the [text messages] sent by [the respondent] 'support the notion that [the respondent] would engage in verbalizations that would cause fear or intimidate [the mother], make her feel that he might do something dangerous or he might engage in threatening behaviors which would potentially cause her fear for herself [and] fear for the children.' He also testified that he was disheartened by the delay in commencing coparenting services, which had not yet commenced, and that [such delay] increased his doubts that the parents could get past their conflicts.

"Dr. Humphrey conducted updated psychological evaluations and interactionals in March and April, 2018. Of note, Dr. Humphrey reported that during this session

with [the respondent], [the respondent] sought information and opinions from Dr. Humphrey regarding specific areas [the respondent] wanted to address, and frequently discussed information already covered in the first evaluation, even after Dr. Humphrey made it clear to [the respondent] that [these areas were] not the focus of the current evaluation. Dr. Humphrey opined after the second evaluation that the issues of intimate partner violence and coercive control continued to exist in the family dynamic and that [the respondent] continued with his controlling behavior since the prior evaluation. Upon being informed that [the respondent] had contacted [the] mother's attorney requesting permission to communicate with [the] mother's therapist to ensure that the therapist was aware of [the] mother's 'behaviors,' Dr. Humphrey noted that '[r]emarkably . . . [the respondent] said he has not exhibited any controlling behavior in two years . . . he continues to minimize his past behaviors' and that [the respondent] reported that in the past [that] 'there was an aspect of control' but 'not the kind that could cause damage.' Dr. Humphrey recommended that [the respondent] continue his therapy with Dr. [Jason] Gockel, who appeared to have [a] good understanding of [the respondent's] control issues and had made progress with him. Dr. Humphrey also noted that he found it 'compelling that [the respondent's] older children were developmentally behind and that Adnan's significant problems . . . led to child protection involvement. Ultimately, the children, [whom the respondent] and [the] mother raised together, were also developmentally delayed in various ways. . . . The more likely explanation for [the] children's delays (which have been remedied) and poor socialization is not innate dysfunction but, rather, poor socialization and lack of . . . support and stimulation.' He noted that [the respondent] suggested [that] his responsibility for meeting the children's day-to-day needs was diminished because he felt this was [the] mother's role, and he had trouble understanding that he also shared responsibility.

"[The respondent] engaged in individual therapy with Bill Powers. He reported that [the respondent's] 'narcissism runs deep' and that he has 'a need to be a better parent.' He noted that he believes that [the respondent] is more controlling than he sees himself. [Powers] opined that he did not believe that [the respondent] could make progress with addressing this in individual therapy. He confirmed that [the respondent] addressed Dr. Humphrey's recommended goals 'to the degree he can' but [the respondent] is 'perceived as being controlling.' He further noted that [the respondent] was engaged in therapy only to meet the requirements of the court. Notably, [Powers] reported that [the respondent] conveyed that the allegations of domestic violence were not accurately portrayed and that it was the domestic violence incident (rather than the allegations in [the

respondent's] affidavit filing in family court) that resulted in the children's removal from the family home. . . .

"[The respondent] also engaged in the [previously] mentioned coparenting services with Attorney Moskowitz. . . . As noted [previously], the court finds [the] mother's concerns regarding the coparenting [sessions] with Attorney Moskowitz well-founded due to [the respondent's] attempt to control the narrative of the sessions. . . . Attorney Moskowitz testified that [the respondent] informed her that there was an agreement that the children would be reunited with [him], that [he] would be in charge, that he would work out a parenting schedule with [the] mother and that the children would be raised in the Muslim faith. Attorney Moskowitz did not independently verify the veracity of this information. This further gives credence to [the] mother's representation that she was not being listened to by Attorney Moskowitz. The court found Attorney Moskowitz' testimony unpersuasive, as she was clearly aligned with [the respondent] and biased against [the] mother. As a result, the coparenting sessions ended unsuccessfully. . . .

"[Next, the respondent] retained Rabbi Hechtman, a licensed family therapist, and engaged in coparenting services with [the] mother shortly after the commencement of the [termination of parental rights] trial. Dr. Hechtman testified that [the] mother and [the respondent] were participating in the services but continued to require additional work on their coparenting issues. Notably, he reported that they realized the seriousness of this matter only after the [termination of parental rights] petitions were filed.

"[The department] engaged in a search for doctoral level therapists to provide [the respondent] with [an] individual therapy [provider who] would accept his insurance and be [in] close vicinity to his home. Several therapists were recommended; however, [the respondent] was not in agreement with the referrals. [The respondent] retained Dr. Leslie Lothstein, Ph.D., a clinical psychologist. Dr. Lothstein testified that he relied on [the respondent's] statements and his 'word' in formulating his report. . . . [The respondent] met with Dr. Lothstein in June and August, 2016. Dr. Lothstein interviewed [the children] . . . on June 13, 2016, and November 28, 2016, and Oais and Muhammed on November 28, 2016. According to Dr. Lothstein's report, dated December 16, 2016, he also conducted a live video camera interview with Safiyah and reviewed Facebook postings of [the] mother, including writings and pictures. He also spoke with [the respondent's] spiritual advisor. He did not interview [the] mother. . . . He did not speak to any [department] social workers. He did not speak to the foster parents. Dr. [Lothstein] testified [that the respondent] handed him a packet of informa-

tion after the completion of his report and prior to his testimony in court in November, 2017. [This information] included Dr. Humphrey's report in addition to Detective [Damien] Bilotto's report regarding his investigation of the domestic violence incident of July 29, 2015. Notably, Dr. Lothstein did not independently verify the veracity of any of [the respondent's] statements to him and solely relied on the information provided to him by [the respondent] in formulating his opinions and answers. . . .

"The court finds Dr. Lothstein's report and subsequent testimony unremarkable due to the clear misrepresentations of information given to him by [the respondent] and pursuant to the court's review of all of the credible evidence submitted in this case. The court further notes the lack of the veracity by [the respondent] of the clearly self-serving 'facts' given to Dr. Lothstein, especially with regard to the circumstances surrounding the allegations made against [the] mother in [the respondent's] affidavit filed with his application for the order of temporary custody and the domestic violence incident of July 29, 2015. Most troubling is [the respondent's] representation to Dr. Lothstein that [the] mother did not want custody of the children and was abandoning them. With the exception of Dr. Lothstein's opinion that [the respondent] 'is overly controlling and obsessive,' and that [the respondent] had little insight [into] the reasons for the failure of his marriages, and that there were still factors of intimate personal violence present in [the] mother's and [the respondent's] relationship, the court gives no credence to any of Dr. Lothstein's opinions and conclusions, as they are based on inaccurate, flawed and biased information given to him by [the respondent]. Further, Dr. Lothstein did not independently verify any of the information given to him by [the respondent]. Therefore, Dr. Lothstein's report was ultimately of no assistance to the court, with the exception of his findings as to [the respondent's] overtly controlling behavior.

"In January, 2018, [the respondent] reported to [the department] that he [had] cancelled an appointment with a therapist due to receiving negative feedback about him. This resulted in a further delay in treatment for [the respondent]. [The respondent] then informed [the department] that he scheduled an appointment with [Dr. Gockel] on January 22, 2018, who was directly retained by [the respondent].

"According to Dr. Gockel, [the respondent] reported to him that he was seeking services to satisfy a court order 'demanding that he complete six sessions on issues of control and the impact this may have on his children.' As noted by Dr. Gockel in his intake note, [the respondent] 'appeared to need to make [Dr. Gockel] understand his innocence regarding the charges of domestic violence and to reassure [him] that he is not

a violent individual.' He further noted that [the respondent] reported a history of depression 'but appears to be suffering from ongoing adjustment disorder related to the removal of his children and ongoing frustrations with the legal system . . . [and] there appears to be an underlying layer of anxiety with possible mild paranoia as he discusses the system being against him.' During the course of the sessions, Dr. Gockel reported that [the respondent] appeared to have difficulty in acknowledging his role in the removal of his children and externalized blame. He also continued to express anger and frustration with regard to [the] mother. While [the respondent] did appear to make progress toward accepting his role in the collapse of his marriage and the removal of his children, Dr. Gockel also noted that [the respondent] appeared 'to struggle with obsessive thinking that results in compulsive behaviors.'

"[The respondent] is currently engaging in weekly therapy with Dr. Gockel. Dr. Gockel reported that [the respondent] is making progress with his goals and continues to demonstrate insight into his role in his marriage without placing blame on [the] mother. He also reported that [the respondent] responds well to discussing his identified goals and is open to the concerns regarding his ongoing controlling behavior. [The respondent] did admit that his role in the children's removal was due to his controlling behaviors and that he should have acted sooner with regard to the 'red flags' he saw concerning [the] mother. Dr. Gockel testified that [the respondent] 'has made significant progress' and has acknowledged engaging in behavior not in his best interest or [that of] others. Dr. Gockel opined that he did not find much evidence of coercive control or intimate partner violence on [the respondent's] part. Dr. Gockel also opined that [the respondent's] text [message] regarding [his] using a knife in the family home was evidence of [the respondent's] impulsive behavior, but [that it] was not an effort to control [the mother].[10] Further, Dr. Gockel testified that while [the respondent] had acquired insight into the children's removal from the home, [the respondent] reported that the removal was due to his complaint that [the] mother put the children in danger due to her boyfriend and that the removal was due to the entrance into the home. Dr. Gockel noted that [the respondent] did accept responsibility for failing to care for the children. . . .

"[The respondent's] initial visits with the children were supervised and were separate from [the] mother's [visits] in light of a protective order in place at that time. Visits were scheduled on Sunday due [to the respondent's] insistence that [that] was the only time [at which] he was available. This created a barrier, as many agencies and workers were not available to conduct supervision of weekend visits; however, [the department] accommodated his request. [The respondent] takes the children on outings during many of the

visits and engages in age appropriate play with them. However, he, at times, has arrived late, left early or took breaks during the visits. At times, he left the visitations for periods of time, leaving the worker to supervise the children. He would often stand or sit and watch the children, and was minimally engaged with them during the visits. He was also observed giving the children money or toys in response to behavioral issues. He often brought excessive gifts to the visits. He often gave Safiyah more gifts than her brothers.

"[The respondent] commenced unsupervised visits on July 11, 2018, at [his] home. [The respondent] had rooms fully prepared for the children and purchased stuffed animals, toys and computers for each of them. [The respondent] also showed the children a 'snack' room in the home filled with many boxes of snacks. The children spent much of the time during the visits on their computers. On July 15, 2018, [the respondent] reported that he began 'segmented' visits with the children wherein he outlined a program of thirty minute increments of activities to promote 'fun, happiness and love' and 'respect and discipline.' [The respondent] would often leave the children unsupervised while he was upstairs in the home. During periods of time when the social workers stopped by [the respondent's] home during the visits, [the respondent] was observed engaging in little interaction and conversation with the children. During a visit on September 16, 2018, on at least two occasions, [the respondent] was upstairs and not present with the children for an extended period of time. Notably, [the respondent] was observed to leave the children unsupervised with Oais and Muhammed, who were living in the home. This was also confirmed by the children, who also reported that Oais and Muhammed 'roughhoused' with them, and [that] they did not like it. During a visit at [the respondent's] home [on] October 7, 2018, [the respondent] left the children in the company of Oais and Muhammed to go to [a] mall. Supervised visitation with [the respondent was] stopped by order of the court (*Burgdorff, J.*) on January 29, 2019, during the pendency of the termination of parental rights trial, due to the credible testimony by the social worker that [the respondent] left the children alone with Oais in light of the credible concerns of inappropriate sexual contact by Oais with Safiyah, and [the respondent's] ongoing and repeated denial of such contact.

"During the supervised visits with the children, [the respondent] would, at times, discuss inappropriate topics with the children, including seeing [the] mother covered in blood, that there were 'real memories' and 'false memories,' and that they had been told incorrect information by the foster parents.

"[The respondent] made telephone calls to the foster home to speak with the children. However, in early

2018, the foster parents refused to engage in the telephone calls with [the respondent] after receiving a threatening e-mail, which stated that emotional abuse was a crime punishable by law and if the foster parents thought they were immune, they were 'dead wrong.' He currently does not have a good relationship with the foster parents and has alleged [that] they have alienated the children from him and from their religion, and are the cause of the children's issues. He also alleged that they have abused the children.

"At [the respondent's] request, an additional one-half hour was added to the visits for the purposes of religious instruction by [the respondent] for the children. In addition, [the department] transported the children to a mosque with [the respondent] in January, 2018, for an hour of religious instruction at [the respondent's] request. Of note, [the respondent] has been observed to use the extra half-hour for religious instruction on only two or three occasions. Prior to 2017, [the respondent] did not engage in prayer with the children during the visits.

"[The respondent] was ordered to engage in family therapy with the children. As noted [herein], the children's therapists did not support [the respondent's] engaging in family therapy at the same time as [the] mother because [the respondent] was not 'grounded enough to make progress in family therapy' with the children. It was noted that Safiyah was 'on the fence about engaging in therapy with [the respondent] and that Omar was resistant. At the first session involving [the respondent], Omar expressed that he was not happy that [the respondent] was present. Notably, [the respondent] falsely stated to DeRosa that the children were not going back to [the] mother because she was not seeking custody. Mr. DeRosa reported that [the respondent] 'appeared to be trying to gather information from the therapy and that [the respondent] continued to place blame on the foster parents and [the department] for the children's current issues. [The respondent] also stated to Mr. DeRosa that the children have been abused in their foster home, and [the respondent] insisted on their removal from the foster home. Mr. DeRosa also noted that [the respondent] continues to have a 'one dimensional view.'

"After a provider meeting in June, 2018, [the department], as noted [previously], recommended reunification of the children with [the] mother. While recognizing that [the respondent] had made progress in his services, including improved parenting skills and a clear love and affection for the children, [the department] had ongoing concerns about [the respondent's] continued lack of ability to take full responsibility for his history of controlling behaviors and his continued ongoing efforts to try to control [the] mother. [The department] also expressed concerns about [the respondent's] deci-

sion-making and the best interests of the children in light of ongoing control issues. [The department] also expressed concerns about the children's consistent resistance to reunifying with [the respondent].

"The record is replete with many instances of [the respondent's] repeated attempts to use coercion and control in his dealings with [the] mother, [the department], the foster parents, and the service providers. As noted [herein], one concerning example is a May 5, 2017 e-mail sent by [the respondent] to [the] mother's attorney requesting to speak directly to her therapist to make sure that the therapist is aware of her 'real symptoms and what really prompted her to injure herself to frame me with a crime, she will never get better and she will not receive the therapy she really needs . . . . I would . . . sign whatever affidavit is [necessary] to grant [the mother] immunity from criminal prosecution and to promise her in writing that I will not press any charges against her . . . . I will drop the civil lawsuit against her in return for her reporting what happened truthfully to her therapist.' Another example is an e-mail sent approximately one week prior to the commencement of the [termination of parental rights] trial to the social worker, along with an attached draft 'agreement' entered into with [the] mother regarding his proposal for the custody of the children. [Although] the e-mail states that it should not be sent to anyone else, [the respondent] forwarded it to the social worker. The e-mail compliments [the] mother as 'smart, mature, intelligent, workable and flexible,' and then goes on to critically discuss [the] mother's 'disturbing' relationship with her boyfriend and her 'psychosexual issues,' which 'may continue to undermine her ability to care for the children or to put them at risk. [The mother's] inability to care for the children was directly related to her secret affair with [her boyfriend].' He then goes on to state that '[m]y position is that the children are better off with their mother as primary caretaker, ideally.' Further, as previously discussed, [the respondent] attempted to exert control over [the] mother by filing numerous motions in the family court and in the juvenile court. The credible evidence clearly and convincingly demonstrates [the respondent's] extensive history of attempts to coercively control [the] mother financially and emotionally. He has made numerous false allegations against her regarding her mental health and drug use, and with regard to the care of the children, all of which has adversely affected the children.

"[The respondent] did eventually admit in his testimony at the [termination of parental rights] trial that he has started to gain insight as to why the children were removed and that the children were removed directly as a result of the affidavit he filed with the family court on July 29, 2015. He also admitted that he completely blamed [the] mother for everything and had since come to realize through therapy that his treatment of [the]

mother triggered the intimate personal violence and coercive control which affected [the] mother and the children in a negative way.

"[The respondent] also testified that he never left the children alone during their unsupervised visits with him at his home and that Oais was never 'a single second alone' with Safiyah, which is clearly at odds with the credible evidence presented during the trial of this matter. The court finds that [the respondent] did leave the children alone for periods of time both inside and outside of the home. [The respondent] also testified that he never asked the children to have overnight visits with him. This testimony is also not credible, as the children reported this information to [the department] and their therapists; in addition, it was heard by a social worker most recently at a visit with the children in January, 2019. The court, as discussed [previously], does not give credence to [the respondent's] testimony that he committed no physical violence or altercations with [the] mother during their marriage. It is abundantly clear that domestic violence occurred when [the respondent] entered the home against [the] mother's wishes on July 29, 2015, and forced himself through the locked bedroom door and that [the] mother sustained injuries all within the hearing of the children. Further, [the respondent appeared] to minimize 'a couple of isolated incidents,' including pushing [the] mother away when he was going to a meeting and [that] Safiyah may have seen him 'pushing her,' all of which constitutes domestic violence. The children have also reported other domestic violence incidents in the house.

"The court is also dismayed at [the respondent's] testimony that he believed [the] mother's concerns regarding inappropriate sexual contact between Safiyah and Oais, when he has repeatedly and consistently denied that it occurred, including verbally expressing [such belief] to this court when the court ordered [that] supervised visitation recommence on January 29, 2019. The court finds deeply concerning [the respondent's] failure to acknowledge and appreciate the significance of the alleged sexual misconduct by Oais with regard to his young daughter, Safiyah. The court further finds that, contrary to [the respondent's] testimony, he has attempted to alienate [the] mother from the children and has attempted to cast her in a disparaging light by making outrageous and disturbing false claims about her. He has repeatedly objected to the prior permanency plans of reunification with [the] mother. His actions clearly belie his words that he respects and supports [the] mother's relationship with the children." (Footnotes in original; footnotes omitted.)

D

Omar

The court's findings with respect to Omar are as

follows: "Omar . . . was born on January 17, 2008. He is the [eldest] child of [the] mother and the fourth . . . child of [the respondent]. . . . Omar was referred to [the] Birth to Three [program for] services until the age of three. He was reportedly diagnosed with autism at the age of three and was evaluated at the Connecticut Children's Medical Center . . . . He transitioned to a special education preschool program and requires a higher level of care, including a higher level of parenting with additional supports from his therapists, pediatrician and support groups.

"Omar, in addition to Safiyah and Muneer, [was] reported by their foster mothers as infantile and developmentally behind when they arrived at the foster home. Of special concern to the foster parents was the children's lack of toilet training, [their use of] diapers, and [their] lack of basic hygiene. . . . As noted [previously], the children were ages five, four and three at the time they were placed in their current foster home. . . .

"[Omar] was seen at the Center for Allergy, Asthma and Immunology in September, 2018 . . . . He is considered medically complex due to his asthma. . . .

"He is currently enrolled in the fifth grade. In February, 2017, it was determined that Omar no longer needed special education services and [an education plan that was created pursuant to § 504 of the Rehabilitation Act of 1973; see 29 U.S.C. § 701 et seq.] was initiated. As of February, 2018, Omar's teacher reported that he had become more vocal and had formed a small group of friends, with whom he was able to interact appropriately. . . . He continues to require additional assistance with sensory tools and strategies, and extended time on assessments and on class assignments.

"Omar was referred for an autism reevaluation at Western Connecticut Behavioral Health in February and March, 2018. His history of significant trauma related to domestic violence witnessed at home was noted. He was diagnosed with unspecified trauma and stressor related disorder, which was attributed to early complex childhood trauma with an ongoing diagnosis of spectrum disorder requiring support. . . . Omar described his visits with [the] mother positively but was consistently negative in his description of his visits with [the respondent] and has repeatedly expressed that he did not want to see [the respondent] at all. He also consistently expressed his desire to stay with his foster family. The evaluator also opined that Omar's current assessment was consistent with his prior diagnosis of autism spectrum disorder requiring support, although his symptoms have improved substantially: 'Omar's trauma exposure and his lack of interventions early on in his life likely increased the intensity of his symptoms for some time, although with increased stability in his life, he has done well and continued to improve in terms of

his language, social and behavioral functioning . . . . [He] is doing better now that he is in a safe and structured environment where he is learning necessary skills . . . [and] it is likely that Omar will continue to make gains in adaptive functioning if he remains in a safe, structured and stable environment. . . . Omar must be in a home that will be free of his witnessing and/or experiencing any physical, sexual, emotional, or verbal abuse.'

"Omar started therapy at the Child & Family Agency in early 2016. He was diagnosed with post-traumatic stress disorder . . . . He participated in play therapy to lower his level of avoidance by means of gradual exposure. He initially presented as guarded in therapy and transitioned to therapy with Muneer. He was successfully discharged in the fall of 2017. He reengaged in individual therapy there in March, 2018, pursuant to [Judge Lobo's] order. He is addressing his fears and misunderstandings surrounding [the respondent] and Islam.

"Omar also participated in family therapy sessions. His therapist, [DeRosa], noted that Omar's diagnoses in 2017 include autism, persistent depressive disorder, and other reactions to severe stress, and that these were due to his high level of anxiety. . . . Omar reported during therapy to observing domestic violence in the home, and he continued to have challenges in discussing the dysfunction in the family home. [DeRosa] also reported that Omar, as well as Muneer, were not experiencing psychological suffering due to being in foster care. [DeRosa] also noted that Omar had made progress in the therapy and that extended therapy would not be beneficial. As discussed [previously], the children's therapists did not support [the respondent's] engaging in therapy at the same time with [the] mother, as they did not believe that [the respondent] was 'grounded enough to make progress in family therapy.' . . . Eventually, [the respondent] engaged in the family therapy. Notably, both Safiyah and Omar were resistant to [the respondent's] engaging in the family therapy. Omar was able to express that he was not happy that [the respondent] was present at family therapy [visits], but [he] eventually adjusted to [the respondent's] presence. However, Omar was observed to continue to experience anxiety when [the respondent] was in the room. Omar continues with individual therapy, which is going well. . . . Of note, Omar's therapist reported that Omar is 'highly ambivalent' about reunification with his parents.

"Omar engaged in a child abuse consultation at the Greater Hartford Children's Advocacy Center at Saint Francis Hospital and Medical Center on October 8, 2015, for an evaluation due to concerns of witnessing domestic violence between [his] mother and [the respondent]. [Omar] disclosed that [his] mother sustained cuts to

the front of her body after tripping over a cell phone and falling onto broken glass. He further stated that the glass broke because [the respondent] had a bat and hit the glass, causing it to shatter on the floor, and that [the respondent] 'did this on accident.' He noted that if [the respondent] did not have the bat, 'I would not even be here.' He also reported witnessing other incidents of [the respondent] yelling at [the] mother. . . . Omar also reported that he had seen [the respondent] hit [the] mother and then [lie] about it. He also reported that [the respondent] would not let [the] mother eat.

"Omar completed a psychosexual evaluation and risk assessment with Eliza Borecka at the Sterling Center on June 22, 2018, due to allegations made by [the] mother that there could have been a sexual abuse history of all three children by older [half siblings] or a premature exposure to adult sexuality by [the respondent]. Omar reported that he wanted to stay with his foster parents . . . because '[my parents] can't teach me anything good. All I need to learn is with [my foster mother]. I didn't even know how to use the toilet when I lived with my mom and dad. . . . They didn't teach us anything. We were wearing diapers when we came to live with [our foster mothers]. I would wear a pull-up to school. Mom was somewhere. Mostly, our nanny was at home. Dad was at work.' Omar also stated that he did not want to move back home because 'they will just do the same to us. They will just teach us wrong. They would treat us like babies, and [we] will end up behaving like babies. Because they don't know how to grow a baby into someone with no sick mind. They will raise us into a person with a sick mind. . . . We would just become adults with special needs.' Omar described his father as a 'dork and cruel' and that [his] mother 'eventually will not teach us wrong from right . . . .' The evaluator opined that Omar's responses did not indicate clinically significant symptoms of trauma, nor did he exhibit any behaviors indicating potential sexual exposure. . . .

"Omar continues to receive support and case management through The Connection and his therapeutic foster home where he has been placed . . . along with his siblings, Safiyah and Muneer.

"Omar, as well as Safiyah and Muneer, underwent a psychological evaluation with Dr. Eric Frazer, Psy.D., a clinical and forensic child psychologist, on September 19, 2018. Dr. Frazer credibly opined that all three children presented with significant psychological issues. He reported that Omar had a long-standing preference for staying with his foster parents. Omar stated that he 'loved them and want[ed] to stay with them. . . . I've improved a lot as a child since they took care of me.' He also stated that any future communication with [his] mother and [the respondent] should be decided by his foster parents and that, if that occurred, 'he would like

them to be spaced out every three months.' Significantly, when asked what it would be like if he lived with [his] mother, Omar stated, 'I would be really sad. I wouldn't progress anymore and still have visits with my dad. I don't want overnight visits to happen . . . [because] I won't be with [my foster parents]. I wouldn't be safe and wouldn't feel too safe.' When asked what it would be like to live with [the respondent], Omar stated, '[b]asically, the same thing with my mom, and I would also have to be Muslim and I want to be Christian. He would spoil us, like the bad type of spoil; we would just ask for everything and get it, like, not earning anything.' He further stated that he did not want any more visits with his parents. 'No more visits with either parents.' Dr. Frazer noted that Omar did discuss experiences [that] he enjoyed with [his] mother and [the respondent], but 'those positive experiences did not translate into the desire to sustain a parent-child relationship with either parent in the context of living with them.' He further opined as to all three children that, '[w]hat is developmentally consistent in the children's responses is their desire to have predictability, consistency, and permanency in a home with foster parents they perceived as being safe and [reliable] caregivers. This is what all children seek and thrive on, so their preferences do not show abnormal thinking. Given the amount of time [they have spent] in their foster home, it is understandable that they have developed trust and a strong parent-child relationship with their foster parents and wish to maintain it.' Dr. Frazer also credibly testified that the children were doing better qualitatively in their developmental needs, including education and learning needs, their socialization needs, and their emotional needs. . . .

"With regard to [the] mother's and [the respondent's] need for coparenting, Dr. Frazer credibly opined that the referral to a parenting coordinator was due to 'a significant presence of conflict. . . . Parents who are able to coparent successfully in a productive manner don't have the need for coparenting therapy and definitely not a parenting coordinator . . . . [That] tells me that there was a significant level of conflict, a significant amount of coparenting difficulties . . . and that . . . has introduced conflict to the children, which makes it more difficult for each of the parties to parent the children. And, then, in consideration of the special needs of the children, it adds another additional stress.' . . .

"Dr. Frazer also credibly opined that the concern to him in the case 'is, really, instability by innumerable risk factors, risk factors that were identified with education, social development with emotional development, coparenting conflict, things like that.' Most persuasive to the court was Dr. Frazer's opinion that if the children were returned to their home where the behavior of the caregivers was not predictable and consistent, 'their

overall history show[s] that they're at significant risk of regression . . . . They could start lagging academically. They could have difficulty with peer relationships. They could start showing resumption of symptoms associated with anxiety that they . . . had been treated for.' . . .

"Dr. Frazer also compellingly testified that, with regard to the three children's clear preference to remain with their foster parents, '[i]t's more about what they have come to experience as young children in terms of consistency, predictability, expectations, routines, and connection to their caregivers . . . . They've improved academically and socially and emotionally, as well . . . . Those are really the significant factors that I see influencing the articulation of their preferences. . . . [T]he way the children conveyed it to me was the way they described their routines at the foster home. They knew what to expect, what was happening after school. They were able to talk about their day. They had activities that they described that were happening on the weekends. So, it was really about their communication, about their routines and their sense of expectation and familiarity with that which was the way they described their perception versus when they were living with . . . their parents [at which time they] didn't have those things.'

"As noted [previously], Omar also participated in a court-ordered psychological evaluation with Dr. Humphrey in October, 2015, and an additional court-ordered evaluation in late 2018. Dr. Humphrey opined that Omar, along with Safiyah and Muneer, had been 'living in a conflict-laden home environment that has included allegations of intimate partner violence, educational neglect, and counterclaims of parental inadequacy and neglect.' In his 2018 interview with Omar, Dr. Humphrey noted that Omar had thrived at school and in his socializations. He also noted that his posture toward [the respondent] had changed dramatically since his removal in 2015. He expressed that he no longer wanted to go to visits and did not want to go to the mosque, nor did he want to continue to engage in therapy. He also expressed that [his] mother and [the respondent] did not 'teach him and his siblings well . . . .' Dr. Humphrey credibly opined that 'Omar presents as [a] child who received inadequate care with his parents that contributed to social, academic, and developmental delays, and contributed to problems with behaviors, including enuresis and problems with interpersonal communication. He has shown improvement in all these areas since entering foster care . . . .'

"As noted [previously], Omar was placed with his siblings, Safiyah and Muneer, in a therapeutic foster home through The Connection in July, 2015. The foster home consists of two foster mothers and their adopted daughter. There have been no concerns with the foster

home. Muneer and Omar share a bedroom in the home. Omar has been thriving in his foster home where he is well cared for and has been given much needed structure and parenting. Omar continues to receive weekly support and case management from The Connection. Omar has significantly progressed emotionally, physically and educationally since being placed in the foster home. Omar has a strong bond with his foster family, in addition to his brother and sister, and clearly wishes to remain in their care. . . .

"[The respondent's] visits [with Omar] were initially supervised by [the department] and then became unsupervised in July, 2018. As discussed [previously], [Judge Burgdorff ordered that supervised] visits with [the respondent] be reinstated due to credible reports that [the respondent] does not consistently supervise the [children during] visits . . . when they are in Muhammed's and Oais' presence in [the respondent's] home. [The respondent's] visits take place primarily at his home on Sundays due to his work schedule. Omar has expressed, for a significant amount of time, that he does not wish to reunify with either [the] mother or [the respondent] but appears, at times, to enjoy his visits with [the] mother and [the respondent], as well as his older [half siblings], Muhammed and Oais. At times, he has been distant and guarded with [the respondent] but also, at times, has some positive interactions with him. Omar has consistently expressed his opposition to overnight visits with [the] mother or [the respondent], stating that he is 'not comfortable.' At times, he has been resistant in attending visits with [the respondent] but had no issues when attending the visits. He has, at times, refused to speak with [the respondent] on the telephone at the foster home. Notably, after a visit with [the respondent] on July 8, 2018, Omar wet his bed on July 9, [2018], and July 14, 2018, for the first time in approximately four months. Notably, these [incidents] occurred after discussions regarding overnight visits with [the respondent].

"Omar has been consistently adamant in his desire to stay in with his foster family, even going so far as to trying to bribe the social worker in an attempt to ensure [that] he stays there. Omar continues to address these issues in therapy. Recently, he appears to have tired of the visits with his parents and with his service providers. Omar is well bonded with his foster parents, in whose home he has resided with Safiyah and Muneer for almost four years, along with his foster parents' adopted daughter. He has a strong, stable and loving bond with his foster family. He has consistently expressed his wish not to reunify with either [the] mother or [the respondent], and has expressed that he would like to be adopted by his foster parents and that he wants to 'stay with them forever.' Omar's foster parents have expressed their willingness to adopt [the children] . . . if they become legally available to do

so."

## E

### Safiyah

With respect to Safiyah, the court found the following facts: "Safiyah . . . was born to [the] mother and [the respondent] on February 8, 2009. She is [the respondent's fifth] . . . child and [the] mother's second . . . child. [The] [m]other reported that Safiyah met developmental milestones but [that she] was somewhat delayed. She was evaluated by [the] Birth to Three [program for services] but was deemed not eligible. She is in good overall physical health and is fairly active. Her pediatrician noted no ongoing developmental concerns. . . . She has been diagnosed with asthma and is treated at the Center for [Allergy] Asthma and Immunology. . . .

"Safiyah is currently enrolled in the fourth grade and is identified as a regular education student. Due to concerns by [the department] that she required special education services, her school implemented a leveled literary instruction group as an intervention. Safiyah has improved academically and she is currently on grade level with her reading. She is approaching and meeting expectation[s] in several classes. She has several classes where she is not meeting expectations. Safiyah has had several meetings with the school worker due to some behavioral issues.

"Upon entering [the department's] care, Safiyah was placed in a therapeutic foster home through The Connection. She continues to receive weekly support and case management from The Connection. At the time she entered care, Safiyah presented with sexualized behaviors, bed-wetting, was emotionally dysregulated, and hyperactive. . . .

"Safiyah's therapist credibly testified that Safiyah's exposure to domestic violence in the home played a significant factor in her [post-traumatic stress disorder] diagnosis and that she has made significant progress since being placed in her foster home. She has matured, improved her self-esteem and personal advocacy [skills], as well as her overall coping skills. She has developed appropriate boundaries with her brothers and become more vocal in expressing her concerns to adults. Her incontinence issues have resolved, as well. She commenced therapy in early 2016 and was successfully discharged in March, 2018. She continues to work on addressing her fears and misunderstandings with regard to [the respondent] and Islam.

"Safiyah is currently engaging in family therapy sessions with each parent. Her therapist, [Baker], noted that Safiyah adapted and transitioned into therapy, which included the trauma treatment model, and made progress. She improved in her self-regulation and self-esteem, and worked through her past trauma. She did

not disclose any new trauma while in foster care. Over-all, Safiyah has improved her behaviors and has demonstrated the ability to advocate for herself and maintain healthy boundaries with her siblings and her peers. She was discharged from therapy successfully.

"Safiyah engaged in a child abuse consultation at the Greater Hartford Children's Advocacy Center at Saint Francis Hospital and Medical Center on October 8, 2015, for an evaluation for sexual abuse due to concerns of witnessing domestic violence between [her] mother and [the respondent] as well as allegations of inappropriate contact by an older [half brother], and possible exposure to pornography. During the forensic interview, Safiyah reported observing multiple incidents of domestic violence between [her] mother and [the respondent], including [the respondent] throwing a glass at [her] mother, that [her] mother was bleeding, and that [the respondent] was mad at [her] mother and pushed her. She also reported other past incidents [in which the respondent] pushed [her] mother. She reported that [her] mother 'doesn't ever do anything bad to my dad. It's only my dad.' She reported an incident while in the family car when [the respondent] told [her] mother he was 'going to explode' her. She also reported witnessing [her] mother being pushed and hit by [the respondent]. She also reported that Muneer and Omar touched her 'private space . . . with their hands under their clothing . . . lots of times.' She also stated that Muneer made her touch his 'private spot.' Therapy and a medical evaluation was recommended.

"Safiyah was referred for a psychosexual evaluation in July, 2017. She reported a history of domestic violence between [her] mother and [the respondent]. Safiyah was reported to have a number of behavioral issues when she came into [the department's] care, including inappropriate boundaries and touching with her siblings, and being inappropriately touched by an older [half sibling]. There were concerns [that] she was exposed to inappropriate sexual content prior to her removal. She also struggled with daily routines. Concerns were raised regarding [the respondent's] affectionate behavior with her, as well as Omar and Muneer, especially in light of the [respondent's] awareness of the children's sexual behaviors.

"Safiyah underwent a psychosexual evaluation and risk assessment at the Sterling Center on June 22, 2018. Safiyah reported that she was living in [a] foster home 'to be safe' and because 'we were not treated well.' She reported that [her] mother and [the respondent] 'did not teach us anything.' She reported Muneer touching her on her private body parts, but the evaluator noted that [such contact] did not exceed 'normative physical exploration between the siblings.' She also reported that [her] mother had all three children take showers together and that the cats were allowed to urinate on the

children's beds. The evaluator opined that 'the evident hygiene issues and inadequate boundaries perhaps illustrate deficient understanding of responsible parenting by the adult who was providing direct care to Safiyah and her siblings at home.' She further opined that Safiyah's responses to questions did not indicate clinically significant symptoms of trauma but that she needed further mental health support focusing on her anger, boundaries and coping skills. She further noted that '[i]t is likely that she is suppressing her true feelings in order to please the people around her.'

"As noted [previously], Safiyah underwent an evaluation with [Dr. Frazer] on September 19, 2018. Safiyah reported that she felt closest to her foster family, and Omar and Muneer. She stated [that] she wanted to continue living with her foster parents and that she liked it there: 'Because it's fun there. We go places a lot . . . . It makes more sense . . . . Like, let's say we got in trouble and asked for our tablets, [her foster mother would] say no. At home with mom or dad, [they] would say, yeah, sure.' Safiyah expressed ambivalence and uncertainty in continuing communication with [her] mother and [the respondent], and indicated [that] she would like to do it by telephone. She also stated [that] she would like to continue seeing them at their homes but with no overnight visits. Notably, she expressed [that] she did not want to live with either [her] mother or [the respondent]. . . .

"Safiyah initially had supervised visits with [her] mother and [the respondent]. She was initially resistant to the visits with [her] mother and [the respondent]. . . . [The respondent's] visits were initially supervised by [the department] and then became unsupervised. As discussed [previously], [Judge Burgdorff] . . . ordered [that the respondent's] visits be supervised in [light] of reports that [the respondent] does not consistently supervise the visits between Omar, Safiyah and Muneer when [the children are] in Muhammed's and Oais' presence. [The respondent's] visits take place primarily at his home on Sundays due to his work schedule. . . . Safiyah appears to enjoy her visits with [her] mother and [the respondent], as well as her older [half siblings] . . . . She appears to have developed a positive bond and has not reported any concerns. However, Safiyah has consistently stated that she does not wish to have overnight visits with either [her] mother or [the respondent], and that she does not want to reside with either [her] mother or [the respondent]. She also stated that she does not like to go to the mosque and that she does not understand why she has to go when she had not gone before.

"As noted, Safiyah was placed, along with her siblings, Omar and Muneer, with her foster parents and their adopted daughter after entering [the department's] care in 2015. She is well bonded with her foster family,

in addition to Omar and Muneer, and is emotionally attached to them."

F

Muneer

With respect to Muneer, the court found the following facts: "Muneer . . . was born to [the] mother and [the respondent] on March 4, 2010. He is [the respondent's] sixth . . . child and [the] mother's third . . . child. [The] [m]other reported that Muneer met all developmental milestones. However, his pediatrician reported that he had a history of delayed milestones but [that he] has no current concerns. He is in overall good health. . . . He is deemed medically complex due to his diagnosis of asthma, for which he is seen at the Center for Allergy, Asthma and Immunology. . . .

"At the time Muneer entered [the department's] care in 2015, he was placed in a therapeutic foster home through The Connection. He continues to receive weekly support and case management from The Connection. At the time of his removal, Muneer was experiencing issues with bed-wetting and hygiene. . . . Since being placed in his foster home on July 31, 2015, those issues have resolved.

"Muneer is currently enrolled in the third grade, where he is identified as a regular education student with no educational or developmental concerns noted. . . .

"Muneer is currently reported to be an overall happy child and is fairly well-behaved. Muneer was initially engaged in individual therapy at the Child and Family Agency in 2016, and consistently attended until fall, 2017, when he was successfully discharged. He then reengaged in therapy in March, 2018. He is also engaged in a school-based program to avoid missing time at school. Muneer's therapy focuses on his fears and misunderstandings surrounding [the respondent] and Islam. Muneer appears to enjoy talking about his feelings. He occasionally displays oppositional behaviors, including talking back to his foster parents. Muneer has also been engaging in family therapy with [his] mother and [the respondent], and his siblings. Muneer has made improvements in that he is better able to articulate his feelings and implement the coping skills [that] he has learned in therapy.

"Muneer underwent a forensic interview at Saint Francis Hospital and Medical Center's Children's Advocacy Center on October 8, 2015. Muneer did not engage and did not want to discuss the domestic violence incident at the family home on July 29, 2015. No assessment was made due to his refusal to engage.

"Muneer underwent a psychosexual evaluation and risk assessment at the Sterling Center on June 22, 2018. Muneer had been diagnosed with dysthymic disorder

and other reactions to severe stress. He also reported a history of domestic violence between [his] mother and [the respondent]. At the time he was placed in [the department's] care, Muneer had a number of behavioral issues, including inappropriate touching and boundaries with his siblings. He reported a history of nightmares and intrusive thoughts. . . . The foster parents received a call from Muneer's school reporting that Muneer was humping another boy and [had] locked himself and the little boy in a bathroom stall. His foster parents described him as [engaging in] sexual/fantasizing behaviors. Muneer reported that he had touched Safiyah in her private area but did not do it anymore. Muneer reported seeing [his] mother and [the respondent] without clothes on the television at his parents' home. He reported that Omar and Safiyah saw it, as well. The foster parents reported that, as of the time of the evaluation, he had not engaged in that type of behavior for approximately a year and a half. He also had issues with being controlling and demanding, and [he] engaged in long temper tantrums in the foster home and in public. Those behaviors were reported to have improved since [he was] placed in his foster home. The evaluator opined that Muneer's responses indicate clinically significant symptoms of trauma with elevated responses in the areas of anxiety, depression, post-traumatic stress, sexual concerns and sexual preoccupation. He exhibited significant distress when discussing the topic of sexuality and physical boundaries. . . . It was noted that . . . Muneer's exposure to sexual content in the years prior to his removal continued to generate a very strong response in Muneer. As the evaluator noted, Muneer's exposure to the sexual content would likely cause him to react to it through unusual behavior, and his reactivity will be displayed as sexualized behavior, as demonstrated in his sexualized behavior with Safiyah and the child at his school. His evaluator opined that Muneer presented as a child who exhibits significant symptoms of significant stress and emotional burden due to his life circumstances, '[and] he reports symptoms of anxiety, depression and confusion about where his life is going and he desperately needs stability and resolution to the turmoil he has been experiencing in the past three years.' . . .

"Muneer underwent an evaluation with [Dr. Frazer] on September 19, 2018. Muneer expressed feeling closest to [his] mother but that he did not want to stay overnight at either [his] mother's or [the respondent's] homes. Muneer expressed that he wanted to continue living with his foster parents '[b]ecause they taught me everything I need to know . . . they taught me right from wrong. I don't think my biological parents are ready for kids yet . . . [t]hey don't teach me things I need to know. They taught me things that are not right. I love them but if they are going to treat me that way, I just don't want to stay with them.' He further stated

that, '[o]ne day, my dad threw a glass at my mom, and I had to go stay with someone else.' Muneer also noted that he would miss [his] mother and [the respondent] if he stayed with the foster parents because he loved them. He was uncertain and ambivalent regarding ongoing communication with [his] mother but did not want to stay in communication with [the respondent]. He also noted that he might consider seeing his parents once a month, as well as [on] special days. . . .

"Muneer initially had supervised visits with [his] mother and [the respondent]. . . . [The respondent's] visits were initially supervised by [the department] and then became unsupervised. Most recently, [Judge Burgdorff] ordered [that the respondent's] visits be supervised in [light] of reports that [the respondent] does not consistently supervise the visits between Omar, Safiyah and Muneer when in Muhammed's and Oais' presence. . . . Notably, Muneer has consistently expressed his opposition to overnight visits with [his] mother or [the respondent], stating that he is 'not comfortable.' He has expressed that his visits with [the respondent] 'are not so good' and that he does not like attending the mosque.

"Muneer is well bonded with his foster parents in whose home he has resided with Safiyah and Omar for almost four years, along with his foster parents' adopted daughter. He has a strong, stable and loving bond with his foster family. He initially expressed that he wanted to live with [his] mother and expressed fear of [the respondent] due to his exposure to domestic violence between his parents. However, most recently, he has consistently expressed his wish not to reunify with either [his] mother or [the respondent] and would like to be adopted by his foster parents."

G

Religion

The court made additional findings concerning the subject of the children's religion, as follows: "As [discussed previously, the respondent] . . . is a practicing Muslim. [The] [m]other was also a practicing Muslim when the children were in her care. She has since expressed the desire to have the children [introduced] . . . to other religions and supports their celebration of other holidays, such as Christmas. [The] [m]other has celebrated these holidays with the children. [The respondent] has consistently not been in agreement. The court finds no credible evidence supporting [the respondent's] claim that the foster parents have attempted to alienate the children from [their] Muslim father. The foster parents are practicing Christians who have not forced the children to engage in religious practices. However, notably, the children reported [that] they did not attend a mosque before their removal. They have also expressed some anxiety regarding their current religious identities. As noted [previously], [the

respondent's] visitation time with the children was increased by thirty minutes for the purpose of religious education, but he has made little effort to engage with the children to discuss religion. He has given the children gifts on Muslim holidays but does not engage in prayer with the children before eating during the visits."

## H

### Adjudicative Findings

In the adjudicative phase of the proceeding, the court, relying on its prior detailed findings concerning the services that were provided to the mother and the respondent to facilitate reunification, determined that the children had proven by clear and convincing evidence that the department made reasonable efforts to reunify the mother and the respondent with the children. The court found that, on December 18, 2017, the children were found to have been neglected.

The court then found by clear and convincing evidence that the mother and the respondent had failed to rehabilitate. The court stated: "[T]he evidence . . . clearly and convincingly demonstrates that [the] mother and [the respondent] have failed to rehabilitate to the extent that the children can be returned to their care or custody. They clearly have not rehabilitated in a timely manner. They clearly cannot adequately meet the children's developmental, emotional and medical needs at the present time, nor in the foreseeable future. Neither parent has gained the necessary insight and ability to care for their children, given their ages and needs, including their special needs, within a reasonable period of time. . . . They have not sufficiently and successfully engaged in rehabilitation in a timely manner nor have they made adequate progress to the extent that it is safe for the children to return to their care, given their ages and need for permanency. Further, giving them additional time to [rehabilitate] is neither in the children's best interests nor in their need for permanency in light of their clear failure to do so over the past four years.

"The evidence clearly and convincingly reveals that [the] mother and [the respondent] continue to have a significant lack of parenting skills, including coparenting skills. Prior to the children's removal from the home, both parents relied on a series of nannies and babysitters to care for the children. [The] [m]other was often out of the home or sleeping late. [The respondent] was working. They both failed to teach the children basic tasks, such as toilet training and personal hygiene. The court finds it both disturbing and remarkable that these children were not toilet trained and were using diapers at the time [that] they were placed in their current foster home. They both failed to ensure that the children attended school and arrived [at] school on time. Neither were involved in the children's day-to-day lives, and

both failed to meet some of their basic needs. [The respondent] denied responsibility for their day-to-day needs and consistently blamed [the] mother.

"Further, these parents engaged in intimate personal violence in the home and in the family car, in the presence of the children, on at least several occasions. The clear and convincing evidence shows a clear pattern of intimate personal violence, including coercive control, by [the respondent] toward [the] mother during their marriage and since the children's removal. He has repeatedly attempted to control [the] mother emotionally and financially. He has continuously made many false aspersions regarding [the] mother to [the department] and the providers. [The respondent's] failure to sufficiently rehabilitate is clearly exemplified by [his] conduct and words over the four years since the children's removal. [The respondent] has consistently maintained that he has not done anything wrong and [has] failed to fully accept responsibility for the role he played in the removal of his children. He clearly misrepresented, if not outright lied, regarding the circumstances surrounding the children's removal, and blamed [the] mother for filing what he characterized as false charges against him with regard to the July 29, 2015 domestic violence incident in the home. He also clearly failed to sufficiently gain the necessary insight into his coercive and controlling nature in his relationship with [the] mother and how this impacted the care of his children both before and after their removal. [Although the respondent] eventually admitted that he had committed some controlling behaviors toward [the] mother, that realization was much too little and much too late. His actions and words belie that belief, as his coercive control continued up to the commencement of the  .  .  . trial. Further, it is abundantly clear that [the respondent] has always put his interests first and the children's second. His actions have clearly been damaging to the children and to their relationship with [the] mother. It is abundantly clear that the [respondent] has utterly failed to gain sufficient insight into his ongoing need to exert control.

"[Although the respondent] has consistently reported a positive relationship with [the] mother and the importance of her role as the mother of the three children, his actions and words also clearly belie those statements. He has vehemently opposed [the department's] plans of reunification with [the] mother and continually presented evidence that [the] mother was unfit to parent the children, made numerous false allegations against her and has made extensive efforts to prevent [the] mother from reunifying with the children. As discussed [previously], [the respondent], in his affidavit filed with the family court, made many outrageous and false statements vilifying [the] mother and her care of the children. Further, [the respondent's] actions and statements have detrimentally impacted the children. There is clearly

an overwhelming need to control on the part of the [respondent], and he has not been able to sufficiently overcome that need through his services. He has clearly been unable to gain the necessary insight into his ongoing issues in a timely manner to make it even remotely possible to return the children to his care in a reasonable period of time.

"[The department] offered timely and reasonable services to [the respondent]. Any delay in receiving those services is directly attributable to [the respondent]. As discussed [previously], [the respondent] was not in agreement with several of the recommended treatment providers and retained his own. Further . . . the record is replete with numerous instances of [the respondent's] coercive control in all aspects of this case, from [the department], [the] mother, the service providers and, most importantly, the children. [The respondent] attempted to manipulate and control some, if not all, of the providers, especially Dr. Lothstein and Attorney Moskowitz, by giving incorrect and misleading information. It was that coercive and controlling influence with Attorney Moskowitz that led to [the] failure of the coparenting services and required another coparenting provider, which commenced only recently.

"[The respondent] consistently presented himself in the best possible light and often blamed [the] mother, in addition to [the department] and the foster parents. He has made disparaging remarks about the foster parents on at least several occasions and has blamed them for their ongoing issues. He also testified that he had a 'very friendly and benign relationship' with the foster parents. The credible evidence clearly demonstrates that [this characterization] is not true. [The respondent's] actions and words have clearly demonstrated his inability to put his children's needs ahead of his own. Further, the court is concerned regarding [the respondent's] testimony that he would continue to assist [the] mother financially and allow the children [to have] access to her if the court terminated her parental rights, which is clearly indicative of his ongoing desire to control [the] mother.

"[Although the respondent] did eventually make some limited progress in his therapy [by] admitting to his control issues . . . these limited admissions are woefully insufficient to support a finding of a sufficient degree of rehabilitation. He certainly did not come to those realizations within a reasonable period of time. . . .

"As also discussed [previously], [the department] also facilitated supervised and unsupervised visits with [the respondent]. It accommodated [the respondent's] insistence that the visits be held on Sundays to accommodate his work schedule. As discussed, [the respondent] failed to ensure that the children were not left unsupervised after the unsupervised visits commenced, and [he]

allowed his older sons to be alone with the children. [The respondent] was well aware of the concerns of inappropriate sexual contact with Safiyah but failed to consider her safety and well-being during the visits. This not only clearly demonstrates [the respondent's] lack of insight but also a clear lack of judgment. Rather than putting the safety of his children as a priority, he continued to deny [that] any inappropriate sexual contact occurred through the trial of this matter. He has also failed to engage on a consistent basis with the children during the visits, thus failing to provide the routine and structure they clearly need.

"In light of the above, the court finds that [the respondent] failed to sufficiently rehabilitate in that he has failed to attain a level of stability to permit his children to be safely placed in his care. He has made limited progress with his ongoing significant control issues, which has been an impediment to his gaining any lasting benefit from his services. He has failed to gain the necessary insight into his ongoing issues, which prevents him from successfully reuniting with his children. . . . [Although the respondent] did eventually comply with his court-ordered specific steps, that is not enough to show rehabilitation. . . . Further, in determining whether a parent has achieved sufficient personal rehabilitation, the court may consider whether the parent has corrected the factors that led to the initial complaint, regardless of whether those factors were included in the specific expectations ordered by the court or imposed by [the department]."

The court concluded that the mother had not rehabilitated. The court then stated: "The court notes that [the] mother and [the respondent] appear to love their children, and the children, at times over the past four years, have indicated their love and affection for [their] mother and [the respondent], but that is simply not enough to support reunification. . . .

"Of paramount consideration to the court is the issue of stability for [the children]. . . . Our laws recognize that a child is legally entitled to some minimal standard of safety, which should include a parent's desire to protect and keep their children safe in all ways, including physically and emotionally. [The] [m]other and [the respondent] have failed in their ability to sufficiently demonstrate their ability to parent and meet these critical needs of their three children. [The children's] need for permanence far outweighs any remote chance that [the] mother or [the respondent] may rehabilitate in the far distant future, which they clearly have not done since the children's removal. Either due to lack of ability or desire, [the] mother and [the respondent] have failed to successfully accomplish in the past four years what was needed to consider reunification as an appropriate conclusion. They cannot provide their children with a nurturing, safe and structured environment. They have

clearly repeatedly failed to put the needs of their children ahead of their own, both prior to and subsequent to [the children's] removal from the home. They have each failed to sufficiently understand the detrimental impact of their actions, or lack thereof, on the children. These children cannot afford to wait for their parents to rehabilitate. The [children] . . . have presented compelling evidence that they need permanency and stability now.

"Accordingly, the court finds that, based upon the credible testimony and documentary evidence presented, [the children] . . . have met their burden of proof by the rigorous standard of clear and convincing evidence, that [the] mother and [the respondent] have failed to achieve the degree of rehabilitation that would reasonably encourage the belief that, within a reasonable period of time, considering the ages and needs of these three children, either [the] mother or [the respondent] could assume a responsible position in the children's lives. They have each clearly failed to sufficiently address their ongoing issues and parental deficiencies that gave rise to [the department's] involvement. Further, the court also finds by clear and convincing evidence that to allow [the] mother or [the respondent] additional time to rehabilitate would adversely affect the children's emotional stability and well-being, especially in light of the children's ongoing special needs and their desperate need for permanency, four years after their removal. Either through lack of ability or lack of desire, neither parent has made sufficient progress toward addressing the child protection issues or their rehabilitative status as it relates to the children's ongoing needs. [The] [m]other's and [the respondent's] ongoing limitations and deficits have clearly proven to be an insurmountable barrier to reunification." (Citations omitted.)

II

DISPOSITIONAL FINDINGS

In the dispositional phase of the proceeding, the court made findings concerning each of the criteria set forth in § 17a-112 (k). Thereafter, the court made findings concerning the best interests of the children, in relevant part, as follows: "It is clear that [the children] cannot be returned to their mother or [to the respondent]. The court has balanced each child's intrinsic need for stability, sustained growth, development, well-being and permanency against the potential benefits of maintaining a connection with their biological parents. . . . In consideration of all these factors and after weighing all of the evidence, the court finds that the clear and convincing evidence has established that it is in the best interests of [the children] to terminate the parental rights of the . . . mother and the respondent . . . to ensure that they each have a secure and safe placement so [that] they can continue to grow, thrive and mature

to become productive children and adults. They need the permanency and stability that their foster parents will continue to provide for [them], as they have successfully done over the past four years. As our courts have long observed, the deleterious effects of prolonged temporary care is well known. . . .

"[The children] need this closure of the uncertainty in their lives and the removal of the possibility of returning home to their mother or [the respondent], the thought of which has caused them undue stress, anxiety and emotional discomfort. As noted by Dr. Frazer, the children have a fear of removal from their foster parents, which causes them anxiety, and to remove them from their foster parents after four years would be traumatic. Neither [the] mother nor [the respondent] offer any reasonable prospect of providing any form of the stability, safety and permanency that these three children need in the foreseeable future. The evidence, as discussed in detail . . . clearly and convincingly establishes that neither [the] mother nor [the respondent] is a stable and competent caretaker for [the children]. . . . The court is aware of the affection that the children have, at times, felt for their parents. However, the court, based on the evidence presented, does not find a strong bond between any of the children with either [the] mother or [the respondent]. This, in conjunction with each parent's inability to substantially and sufficiently benefit from their treatment and services, clearly indicates that reunification cannot occur in the near future. . . . Any further delay would be clearly detrimental to the children. The clear and convincing evidence has demonstrated that their strongest and most compelling bond is with their foster parents. It is abundantly clear to the court that these three children have thrived in their foster home . . . . They receive the attention, care and love that they were clearly lacking in the care of [the] mother or [the respondent]. Since placement in the foster home, the children significantly improved physically, educationally and emotionally. They are much more emotionally stable, better at communication and their basic hygiene has improved. The inappropriate sexual touching between them has stopped. The bed-wetting has greatly diminished. The foster parents are providing excellent parenting to these three children and they have flourished in that care. These three children have a strong and loving bond with their foster family. They consider their foster parents their parents. They look to them for care, love and support. They love their foster sister. They love each other. . . . The children's need for stability, predictability, and permanency, which they currently have in their foster home, far outweighs any need to maintain a connection with [the] mother or [the respondent]. The court concludes that it is clearly not in the children's best interest[s] [to maintain such connection].

"The court must reiterate and emphasize in its best

interest[s] findings that [the children] have consistently, repeatedly, and adamantly stated that they do not want to return to either [the] mother's or [the respondent's] care. The court finds their statements and desires quite compelling and quite understandable in light of the totality of the circumstances of this case. They have all expressed the desire to be adopted by their foster parents. Further, the court must also credit these children for their deep insight into the flawed parenting and care received from their parents while in their care. These statements emphasize the court's finding that the care of these children was never a priority for these parents.

"Accordingly, after considering the children's ages and the totality of the circumstances, the court finds that termination of [the] mother's and [the respondent's] parental rights is in the best interests of . . . [the children]. The convincing and clear evidence has established that [the] mother and [the respondent] are in no better position today to provide for their children than they were at the time of their removal. The problems that led to the children's removal have not been rectified, and the prospects of improvement are bleak at best, especially in light of the fact that these children have been out of the parents' care for four years. Despite all of the services offered and provided to [the] mother and [the respondent], they have clearly not sufficiently benefited from those services in which they did engage. . . . These children need the security and safety of a stable and permanent home, which is clearly found in their current home. Further, the court finds that it would be clearly detrimental to the well-being of these children to delay permanency any longer in order to allow [the] mother and [the respondent] additional time to rehabilitate especially when they have not successfully done so over the past four years. This conclusion is clearly and convincingly supported by the testimony of the witnesses as well as the information contained in the exhibits presented at the time of trial." (Citations omitted.)

The court ordered that the parental rights of [the] mother and the respondent be terminated, denied [the] motions to revoke [the] commitment [of the children to the care and custody of the commissioner] that had been filed by [the] mother and the respondent, and appointed the commissioner to be the statutory parent of the children.

### III

### JUDICIAL BIAS

The first claim raised by the respondent is that judicial bias deprived him of a fair trial. We disagree.

In analyzing his claim of judicial bias, the respondent draws our attention to a myriad of specific statements and rulings made by the court, both prior to and during

the lengthy trial.[11] Additionally, the respondent draws our attention to isolated portions of the court's lengthy memorandum of decision. The respondent views these rulings, comments, and findings as evidence of bias. He argues that the court "made numerous flagrantly prejudicial comments before the commencement of the trial and during the trial, and conducted [itself] in a prejudicial manner throughout the trial. [The court's] bias clearly manifested when [it] arrived at a conclusion wholly antithetical to individual and cumulative witness testimony." (Footnote omitted.)

In attempting to demonstrate bias on the part of the trial court, the respondent states in general terms that the court had "a prejudicial agenda." The respondent argues that the court improperly relitigated "the findings of prior neglect,"[12] predetermined several of the factual issues in the case,[13] drew inferences adverse to him solely on the basis of motions that he [had] filed against [the] mother,[14] deprived him of his right to consult with counsel during trial,[15] and made many evidentiary rulings that were adverse to him.[16] The respondent argues that the court erroneously "preclude[d]" the testimony of several witnesses, including Moskowitz, Gockel, Lothstein, Humphrey, Hechtman, [department social worker Michael] Jones, [the] mother, and himself. He also argues that the court's decision was unfair in that the court engaged in "strong condemnation of [him] throughout [its memorandum of decision] at every possible opportunity." The respondent argues that the court's decision was unsupported by the evidence and that the court "relied on substantial ambiguity in [its] decision to mask unlawful discrimination" against him. The respondent repeatedly characterizes the court as being partial, but he does not articulate a reason *why* the court was biased against him, let alone suggest that the court had any type of personal or pecuniary interest in the outcome of the trial.

The respondent does not dispute that he did not raise a claim of judicial bias before the trial court, ask the court to recuse itself, or move for disqualification. He has chosen, instead, to wait to raise a claim of this nature only after the court rendered its judgments terminating his parental rights. The respondent summarily states that he seeks review under the doctrine of plain error or under the doctrine set forth in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).

"It is well settled that courts [generally] will not review a claim of judicial bias on appeal unless that claim was properly presented to the trial court through a motion for disqualification or a motion for a mistrial. . . . Because an accusation of judicial bias or prejudice strikes at the very core of judicial integrity and tends to undermine public confidence in the established judi-

ciary . . . we . . . have reviewed unpreserved claims of judicial bias under the plain error doctrine [when raised on appeal]." (Citation omitted; internal quotation marks omitted.) *Michael G.* v. *Commissioner of Correction*, 153 Conn. App. 556, 561–62, 102 A.3d 132 (2014), cert. denied, 315 Conn. 916, 107 A.3d 412 (2015).

In his brief, the respondent has invoked the plain error doctrine, and we construe his arguments to constitute an analysis under the plain error doctrine. We will review the claim of judicial bias under the plain error doctrine because, as the respondent argues, it implicates the concept of a fair trial. "The plain error doctrine is an extraordinary remedy used by appellate courts to rectify errors committed at trial that, although unpreserved, are of such monumental proportion that they threaten to erode our system of justice and work a serious and manifest injustice on the aggrieved party. [T]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . In addition, the plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly. . . .

"When an appellate court addresses a claim of plain error, the court first must determine if the error is indeed plain in the sense that it is patent [or] readily discernable on the face of a factually adequate record, [and] also . . . obvious in the sense of not debatable. . . . This determination clearly requires a review of the plain error claim presented in the light of the record. . . . In addition, the reviewing court must examine that error for the grievousness of its consequences in order to determine whether reversal under the plain error doctrine is appropriate. A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice." (Citations omitted; internal quotation marks omitted.) *Tala E. H.* v. *Syed I.*, 183 Conn. App. 224, 233–34, 192 A.3d 494 (2018), cert. denied, 330 Conn. 959, 199 A.3d 19 (2019).

"[A] claim of judicial bias strikes at the very core of judicial integrity and tends to undermine public confidence in the established judiciary. . . . No more elementary statement concerning the judiciary can be made than that the conduct of the trial judge must be characterized by the highest degree of impartiality. If [the judge] departs from this standard, he [or she] casts serious reflection upon the system of which [the judge] is a part. . . .

"In reviewing a claim of judicial bias, this court

employs a plain error standard of review. . . . The standard to be employed is an objective one, not the judge's subjective view as to whether he or she can be fair and impartial in hearing the case. . . . Any conduct that would lead a reasonable [person] knowing all the circumstances to the conclusion that the judge's impartiality might reasonably be questioned is a basis for the judge's disqualification." (Internal quotation marks omitted.) *State* v. *Cane*, 193 Conn. App. 95, 133–34, 218 A.3d 1073, cert. denied, 334 Conn. 901, 219 A.3d 798 (2019).

After reviewing the arguments set forth in the respondent's appellate brief, the transcript of the proceedings before the trial court, and the court's memorandum of decision, we conclude that the respondent's claims of judicial bias do not, in actuality, relate to what is commonly viewed as judicial bias at all. The respondent's claim, as it relates to several adverse rulings and findings, does not constitute evidence of bias. The respondent may disagree with the court's factual findings, yet we conclude that they were plainly based on the evidence, relevant to the issues before the court, and thoughtfully set out in the court's memorandum of decision.[17] The respondent's disagreements with the court's rulings throughout the trial generally are not a proper basis for a claim of judicial bias. "[A]dverse rulings do not themselves constitute evidence of bias. . . . Obviously, if a ruling against a party could be used as an indicia of bias, at least half of the time, every court would be guilty of being biased against one of two parties. Moreover, the fact that a trial court rules adversely to a litigant, even if some of these rulings were determined on appeal to have been erroneous, [still] does not demonstrate personal bias. . . . The fact that [a party] strongly disagrees with the substance of the court's rulings does not make those rulings evidence of bias." (Citation omitted; internal quotation marks omitted.) *Burns* v. *Quinnipiac University*, 120 Conn. App. 311, 317, 991 A.2d 666, cert. denied, 297 Conn. 906, 995 A.2d 634 (2010).

The flaw in the respondent's numerous references to comments and findings that were adverse to him is that, in each instance, the court based its opinion on facts in evidence and, rather than merely reflecting hostility to him, they were relevant to the issues before the court. As this court has observed: "[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives

from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." (Emphasis in original; internal quotation marks omitted.) *Schimenti* v. *Schimenti*, 181 Conn. App. 385, 395, 186 A.3d 739 (2018).

The respondent complains at length that the court "relitigated" the "findings of prior neglect" made by Judge Lobo in the neglect proceeding. In terminating the respondent's parental rights, the court relied on the fact that, during a prior proceeding, the children were found to be neglected. The respondent erroneously conflates the finding of neglect, which the court in the present proceeding was unable to relitigate; see, e.g., *In re Stephen M.*, 109 Conn. App. 644, 647, 953 A.2d 668 (2008) ("a party is barred by the doctrine of collateral estoppel from relitigating a previous finding of neglect during a subsequent termination trial"); with the court's assessment of some or all of the same evidence that may have been presented to the court that heard the prior neglect proceeding. With respect to the evidence presented during the neglect proceeding, the respondent does not cite to any authority that supports his belief that the court at the subsequent termination of parental rights trial may not independently assess such evidence in evaluating whether rehabilitation, which is factually and legally distinct from neglect, had occurred.

In this vein, the respondent states that it was evidence of judicial bias for the court in the present case to have "placed the blame" for the children's neglect on him, despite the fact that Judge Lobo had not done so during the neglect proceeding. He also faults the court for holding him responsible for the domestic violence incident, characterizing such finding as being contrary to the findings of Judge Lobo in the neglect proceeding. An adjudication of neglect relates to the status of the child and not necessarily parental fault, yet a court in a neglect proceeding nonetheless may clearly identify who is responsible for that status. See, e.g., *Matthew C.* v. *Commissioner of Children & Families*, 188 Conn. App. 687, 711, 205 A.3d 688 (2019). It was not improper for the court, in resolving the factual issues before it, to have made subordinate factual findings that, while not made by Judge Lobo during the neglect proceeding, were not in any way contrary to the finding of neglect. Moreover, Judge Lobo plainly stated that it was unnecessary in light of the issues before him in the neglect proceeding to determine whether the respondent had engaged in domestic violence.[18] It was not improper, in evaluating the critical issue of rehabilitation, for the court in the termination proceeding to have made findings concerning the domestic violence incident that had not been made by Judge Lobo previously.

Additionally, there is no basis in the record in support of the respondent's arguments that the court "pre-

clude[d]" several witnesses from testifying. The respondent does not cite to any instance in which any of the several persons identified in his brief were precluded from testifying. All of the persons identified in the respondent's brief, in fact, either testified at trial or, with respect to Lothstein in particular, their opinion was otherwise before the court.[19] The court considered their testimony in its evaluation of the evidence. In essence, the respondent disagrees with the fact that the court did not credit as true some or all of the testimony of Moskowitz, Gockel, Lothstein, Humphrey, Hechtman, Jones, [the] mother, and himself. The court carefully explained its factual findings in its memorandum of decision and, specifically, why it discounted the weight of certain testimony and afforded greater weight to other testimony and evidence. "[A]s a reviewing court [w]e must defer to the trier of fact's assessment of the credibility of the witnesses that is made on the basis of its firsthand observation of their conduct, demeanor and attitude. . . . The weight to be given to the evidence and to the credibility of witnesses is solely within the determination of the trier of fact. . . . In reviewing factual findings, [w]e do not examine the record to determine whether the [court] could have reached a conclusion other than the one reached. . . . Instead, we make every reasonable presumption . . . in favor of the trial court's ruling." (Internal quotation marks omitted.) *McLeod* v. *A Better Way Wholesale Autos, Inc.*, 177 Conn. App. 423, 450, 172 A.3d 802 (2017). The respondent has not persuaded us that the fact that the court weighed the evidence in the manner that it did reflects judicial bias.

For the foregoing reasons, we conclude that the respondent has not demonstrated that plain error exists.

## IV

### FAILURE TO REHABILITATE

Next, the respondent claims that the court improperly found that he failed to rehabilitate. We disagree.

First, we address the respondent's argument that the court misconstrued the proper legal standard for evaluating whether he failed to rehabilitate. The respondent argues that the court improperly failed to limit its inquiry to whether he satisfied the specific steps that were issued and failed to limit its evaluation to the evidence of his rehabilitation that occurred after the specific steps were issued. The respondent also argues that the court misconstrued the legal principle of "coercive control." With respect to the arguments that the court misinterpreted or misapplied current legal principles, we apply a plenary standard of review. See, e.g., *Fish* v. *Fish*, 285 Conn. 24, 37, 939 A.2d 1040 (2008).

The respondent places great emphasis on the following isolated finding in the court's memorandum of deci-

sion: "[Although the respondent] did eventually comply with his court-ordered specific steps, that is not enough to show rehabilitation." Contrary to the respondent's arguments, the court properly recognized that a determination with respect to rehabilitation is not solely dependent on a parent's technical compliance with specific steps but the broader issue of whether the factors that led to the initial commitment have been corrected. This court has explained: "The specific steps facilitate, but do not guarantee, the return of the child to the parent. . . . Although a parent may have participated in the programs recommended pursuant to the specific steps ordered, a court may properly find that the parent has failed to achieve rehabilitation. . . . In other words, a finding of rehabilitation is not based on a mechanistic tabulation of whether a parent has undertaken specific steps ordered. The ultimate issue the court must evaluate is whether the parent has gained the insight and ability to care for his or her child given the age and needs of the child within a reasonable time." (Citations omitted; emphasis omitted.) *In re Destiny R.*, 134 Conn. App. 625, 627, 39 A.3d 727, cert. denied, 304 Conn. 932, 43 A.3d 660 (2012).

We also reject the respondent's argument that it was improper for the court to have considered his conduct as of the time of the children's removal from the family home pursuant to an order of temporary custody in July, 2015, rather than following the children's commitment to the care and custody of the commissioner in December, 2017.[20] Thus, the respondent relies on a belief that the date of commitment constitutes a type of starting point in the rehabilitative process. It is evident that, prior to the date of commitment, the respondent was on notice of the issues that led to the children's removal from the family home.[21] In the interest of reunifying with the children and ensuring that they achieved permanency as soon as possible, the respondent could have taken immediate steps to address the issues. He did not, and his argument that the court improperly considered this fact and, instead, should have viewed the date of commitment as an artificial starting line in the rehabilitative process is not logically sound. Moreover, there is no legal support for the respondent's contention.[22] We also observe that, even if the respondent's argument were correct, he is unable to demonstrate that, if the court had confined its analysis to his conduct beginning in December, 2017, it would have led to a different outcome in the termination of parental rights proceeding. The dispositive issue that was addressed by the court was whether, by the time of the termination trial, the respondent had rehabilitated.[23]

To the extent that the respondent argues that the court misconstrued the meaning of "coercive control," the argument is not persuasive. The respondent, citing to a trial court opinion, urges us to conclude that "coercive control" necessarily encompasses intimidation,

threats, and inducing fear in another. He argues that the evidence did not reflect that he engaged in such activities with the mother after the date when the court issued the specific steps. It suffices to observe that "coercive control" is a factual description of conduct; it is not a term of art for which an objective legal definition exists. The respondent is unable to demonstrate legal error in the court's use of this descriptive term.

We next turn to the aspect of the claim in which the respondent argues that the court erred in concluding that there was clear and convincing evidence that he failed to rehabilitate. "Pursuant to § 17a-112, [t]he trial court is required . . . to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further . . . such rehabilitation must be foreseeable within a reasonable time. . . . Rehabilitate means to restore [a parent] to a useful and constructive place in society through social rehabilitation. . . . The statute does not require [a parent] to prove precisely when [he] will be able to assume a responsible position in [his] child's life. Nor does it require [him] to prove that [he] will be able to assume full responsibility for [his] child, unaided by available support systems. It requires the court to find, by clear and convincing evidence, that the level of rehabilitation [he] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [he] can assume a responsible position in [his] child's life. . . . In addition, [i]n determining whether a parent has achieved sufficient personal rehabilitation, a court may consider whether the parent has corrected the factors that led to the initial commitment, regardless of whether those factors were included in specific expectations ordered by the court or imposed by the department. . . .

"When a child is taken into the commissioner's custody, a trial court must issue specific steps to a parent as to what should be done to facilitate reunification and prevent termination of parental rights. . . . Specific steps provide notice and guidance to a parent as to what should be done to facilitate reunification and prevent termination of [parental] rights. Their completion or noncompletion, however, does not guarantee any outcome. A parent may complete all of the specific steps and still be found to have failed to rehabilitate. . . . Conversely, a parent could fall somewhat short in completing the ordered steps, but still be found to have achieved sufficient progress so as to preclude a termination of his or her rights based on a failure to rehabilitate. . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved [his] ability to manage [his] own life, but rather whether [he] has gained the ability to care for the particular needs of the child at issue." (Citations omitted; internal quotation marks omitted.) *In re Yolanda V.*, 195 Conn. App. 334,

343–44, 224 A.3d 182 (2020).

Our Supreme Court has clarified the standard of review that must be employed by an appellate court in a review of a trial court's finding that a parent has failed to rehabilitate. "We have historically reviewed for clear error *both* the trial court's subordinate factual findings and its determination that a parent has failed to rehabilitate. . . . While we remain convinced that clear error review is appropriate for the trial court's subordinate factual findings, we now recognize that the trial court's ultimate conclusion of whether a parent has failed to rehabilitate involves a different exercise by the trial court. A conclusion of failure to rehabilitate is drawn from *both* the trial court's factual findings and from its weighing of the facts in assessing whether those findings satisfy the failure to rehabilitate ground set forth in § 17a-112 (j) (3) (B). Accordingly, we now believe that the appropriate standard of review is one of evidentiary sufficiency, that is, whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion]. . . . When applying this standard, we construe the evidence in a manner most favorable to sustaining the judgment of the trial court." (Citation omitted; emphasis in original; footnote omitted.) *In re Shane M.*, 318 Conn. 569, 587–88, 122 A.3d 1247 (2015).

"A [subordinate factual] finding is clearly erroneous when either there is no evidence in the record to support it, or the reviewing court is left with the definite and firm conviction that a mistake has been made. . . . [G]reat weight is given to the judgment of the trial court because of [the trial court's] opportunity to observe the parties and the evidence. . . . [An appellate court does] not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling." (Internal quotation marks omitted.) *In re Keyashia C.*, 120 Conn. App. 452, 455, 991 A.2d 1113, cert. denied, 297 Conn. 909, 995 A.2d 637 (2010).

We have set forth the court's extensive findings concerning the adjudicative phase of the termination of parental rights proceeding. The court not only set forth ample findings but also set forth the evidentiary basis of most, if not all, of its subordinate findings of fact. The court's subordinate findings of fact are supported by the evidence and the reasonable inferences to be drawn therefrom. Moreover, the court's ultimate conclusion, that rehabilitation had not occurred, was reasonably based on the subordinate facts established and the reasonable inferences to be drawn therefrom. On the basis of ample subordinate findings made by the court, it was reasonable to conclude that the respondent

had not gained the ability to parent sufficiently. As the court observed, by the time of the trial, the respondent had not recognized his role in the circumstances that led to the children's removal from the home, continued to undermine efforts to reunify the mother with the children, and continued his underlying pattern of exerting control in all matters concerning the mother, to the detriment of his children.[24] The court properly found that the respondent failed to recognize how these failures impacted the children. Moreover, the respondent's issues with several of the service providers undermined a finding that he had learned to control the coercive behaviors that were the focal point of the very services at issue. In short, the findings amply reflected that, by the time of the trial, the respondent had not fully appreciated his parental shortcomings, his inability to coparent with the mother, and his controlling tendencies, even when such tendencies directly affected the children. The weight of the evidence amply supported the conclusion that, despite the fact that the respondent had made some progress, he had not gained the ability to set aside his personal interests and demonstrate an ability to provide a safe, nurturing, and stable home environment for his children.[25]

Having carefully reviewed the arguments in the respondent's brief, they generally may be summarized as an attempt to relitigate the issue of rehabilitation. The respondent has summoned evidence that he believes supports a finding of reunification, and he invites this court to draw inferences that are consistent with a conclusion that rehabilitation had occurred. Much of the evidence on which the respondent relies was explicitly found by the trial court either not to be credible or not to be persuasive. This includes the respondent's own testimony, which the court was free to reject in whole or in part. We observe that, to the extent that the respondent claims error on the ground that the court failed to afford sufficient weight to the opinions of Gockel and Lothstein, such arguments are equally unpersuasive. "The testimony of professionals is given great weight in parental termination proceedings. . . . It is well established that [i]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . The credibility and the weight of expert testimony is judged by the same standard, and the trial court is privileged to adopt whatever testimony [it] reasonably believes to be credible. . . . On appeal, we do not retry the facts or pass on the credibility of witnesses. . . . It is the quintessential function of the fact finder to reject or accept certain evidence, and to believe or disbelieve any expert testimony. . . . The trier may accept or reject, in whole or in part, the testimony of an expert offered by one party or the other." (Citations omitted; internal quotation marks omitted.) *In re Carissa K.*, 55 Conn. App. 768, 781–82, 740 A.2d 896 (1999).

For the foregoing reasons, we reject the respondent's claim concerning the court's finding that he failed to rehabilitate.

V

BEST INTERESTS OF CHILDREN

Next, we address the claim that the court improperly determined that termination of the respondent's parental rights was in the children's best interests. We disagree.

The scope of the respondent's arguments in the present claim is somewhat narrow. He argues that, "the trial court determined that the children's religious affiliation is insignificant in this [termination of parental rights] proceeding" and that, in the dispositional phase of the proceeding, the court "disregarded the children's religious affiliation." The respondent focuses on the undisputed evidence that the children's foster parents were not Muslim and that they had introduced the children to religious beliefs that differed from his Muslim beliefs. The respondent argues that the court disregarded General Statutes § 45a-707 (8)[26] and that, "[i]f the [termination of parental rights judgment] were to be affirmed, the children would have to be adopted by a Muslim family of like religious faith that has the ability to sustain the children's religious affiliation . . . ." The respondent also argues that "[p]lacing the children with yet a different family for adoption is not in the children's interest in sustained growth, development, well-being, and in the continuity and stability of [their] environment." Finally, he asserts that "the foster parents have failed to fulfill their statutory obligation to furnish social and religious guidance for the children, and have intentionally exposed the children to different religious beliefs."

"In the dispositional phase of a termination of parental rights hearing, the emphasis appropriately shifts from the conduct of the parent to the best interest of the child. . . . It is well settled that we will overturn the trial court's decision that the termination of parental rights is in the best interest of the [child] only if the court's findings are clearly erroneous. . . . The best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of [his or her] environment. . . . In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interest of the child. In arriving at this decision, the court is mandated to consider and make written findings regarding seven statutory factors delineated in [§ 17a-112 (k)]. . . . The seven factors serve simply as guidelines for the court and are not statutory prerequisites that need to be proven before termination

can be ordered. . . . There is no requirement that each factor be proven by clear and convincing evidence." (Footnote omitted; internal quotation marks omitted.) *In re Joseph M.*, 158 Conn. App. 849, 868–69, 120 A.3d 1271 (2015).

"On appeal, our function is to determine whether the trial court's conclusion was factually supported and legally correct. . . . In doing so, however, [g]reat weight is given to the judgment of the trial court because of [the court's] opportunity to observe the parties and the evidence. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling. . . .

"[T]he balancing of interests in a case involving termination of parental rights is a delicate task and, when supporting evidence is not lacking, the trial court's ultimate determination as to a child's best interest is entitled to the utmost deference. . . . Although a judge [charged with determining whether termination of parental rights is in a child's best interest] is guided by legal principles, the ultimate decision [as to whether termination is justified] is intensely human. It is the judge in the courtroom who looks the witnesses in the eye, interprets their body language, listens to the inflections in their voices and otherwise assesses the subtleties that are not conveyed in the cold transcript." (Citations omitted; internal quotation marks omitted.) *In re Malachi E.*, 188 Conn. App. 426, 443–44, 204 A.3d 810 (2019).

The respondent's claim is not persuasive for several reasons. First, his insistence that the court deemed the children's religious affiliation to be insignificant is belied by the court's memorandum of decision, which reflected the court's consideration of the children's faith. The court observed that the respondent identified as a member of the Muslim faith and that the length of his visits with his children had been extended for the expressed purpose of permitting him to engage in religious instruction with them. Also, at the respondent's request, the department transported the children to a mosque for the purpose of permitting the children to obtain religious instruction at the respondent's request. As the court found, however, the respondent did not follow through on providing religious instruction to the children on a consistent basis. Also, the court found that, despite the respondent's complaints concerning the religious practices of the foster parents, which were different from those of the respondent, the foster parents had not forced the children to engage in any type of religious practices. The court found that the respondent had not made any significant efforts with respect to fostering religious beliefs in the children, he had not engaged in prayer with the children, and the children,

who had expressed anxiety concerning their religious identities, had not attended religious services prior to their removal from the family home.

Second, the respondent appears to view as a foregone conclusion that the children's religious identities are rooted in the Muslim faith. On the basis of the evidence, the court found that the children's *other* biological parent, the mother, who was a practicing Muslim when the children were in her care, had, during the events leading up to the termination of her parental rights, expressed her desire to introduce the children to other religious practices and had celebrated other religious holidays, such as Christmas, with them. Certainly, in terms of gauging the children's religious identity, to the extent that it was relevant in the dispositional phase of the termination proceeding, the court properly considered the children's religious beliefs, if any, of *both* of their biological parents, not simply those of the respondent.

Third, and most importantly, the respondent's arguments reflect a fundamental misunderstanding of the nature of the court's inquiry and the court's finding in the dispositional phase of the proceeding. As we have stated previously, the court's inquiry in the dispositional phase of the proceeding was properly focused on whether termination of the respondent's parental rights was in the children's best interest. The respondent, however, invites this court to overturn the court's finding on the basis of the unrelated issue of whether the children's foster parents shared his religious beliefs or whether they would fulfill an obligation to raise the children in the Muslim faith. Even if a legal *requirement* exists that the children be placed in a care setting that would nurture the religious faith of the children or the respondent,[27] the respondent has failed to demonstrate how the department's or the court's failure to comply with such requirement is a basis on which to challenge the court's determination that the children's best interests were served by terminating his parental rights. Stated otherwise, the respondent, relying on what he deems to be a weakness in the foster parents, is unable to demonstrate that his parental rights were terminated erroneously. As this court has observed, "[a]fter the statutory grounds for termination are proved by clear and convincing evidence in an adjudicatory phase, the question then to be decided in a dispositional phase is whether it is in the best interests of the child to sever the parent-child relationship. That is different from the question of who should have custody of the child if termination of parental rights is determined to be in the best interests of the child." (Internal quotation marks omitted.) *In re Carissa K.*, supra, 55 Conn. App. 776. Accordingly, we reject the respondent's claim.[28]

VI

DEPARTMENT'S REUNIFICATION EFFORTS

Next, the respondent claims that the court improperly found that the department made reasonable efforts to reunify him with his children. We disagree.

The respondent does not distinctly challenge any of the court's detailed factual findings concerning the many services that were offered to him by the department or the degree to which he engaged in those services. We already have set forth the court's detailed findings in this regard in part I of this opinion and rely on them in the present claim. Instead, the respondent challenges the court's determination that reasonable efforts were made, arguing in broad terms that the department "unreasonably prolonged the stay of the children in foster care for over four years" and, thus, failed to achieve permanency for the children. He also argues in broad terms that the department did not "[address] the children's misunderstandings of their father in therapy . . . ." In specific terms, the respondent argues that the department acted unreasonably in that it suspended his overnight visits with the children. He refers to the fact that, at the time of the neglect proceeding, it was made clear to the court that Omar had expressed his preference not to visit with the respondent. Judge Lobo stated that the matter should be addressed with Omar in a therapeutic setting. In arguing that the subsequent efforts made by the department were unreasonable, the respondent focuses on the fact that the department did not force Omar to have overnight visits with him. He argues: "[The department] took unilateral action by suspending the overnight visits altogether. By doing so, [the department] validated whatever underlying fears that might have been implemented in the children's minds, which prompted them to start to reject overnight visits after their initial acceptance, and thus created an 'untrue barrier' violating the statutory mandate of reasonable efforts." The respondent argues that the department created a barrier between him and his children, thereby undermining what he believes to be the strong bond that existed between him and his children at the time of their removal. Moreover, the respondent argues that the department violated General Statutes § 17a-96[29] by placing the children in a household that did not foster the Muslim faith.

Before addressing these arguments, we set forth some relevant principles. Pursuant to § 17a-112 (j), the court may grant a petition to terminate parental rights "if it finds by clear and convincing evidence that . . . (1) the [department] has made reasonable efforts to locate the parent and to reunify the child with the parent in accordance with subsection (a) of section 17a-111b." In the present case, the petitions for termination of parental rights alleged that such efforts were made and, as our recitation of the court's findings reflects, the court found that such efforts were made. "The 'reason-

ableness' of the department's efforts must be assessed in the context of each case. The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. Neither the word reasonable nor the word efforts is, however, defined by our legislature or by the federal act from which the requirement was drawn. . . . [R]easonable efforts means doing everything reasonable, not everything possible. . . . [R]easonableness is an objective standard . . . and whether reasonable efforts have been proven depends on the careful consideration of the circumstances of each individual case. . . .

"This court has applied the general meaning of 'reasonable' and stated that [i]t is axiomatic that the law does not require a useless and futile act." (Citation omitted; internal quotation marks omitted.) *In re Kyara H.*, 147 Conn. App. 855, 872–73, 83 A.3d 1264, cert. denied, 311 Conn. 923, 86 A.3d 468 (2014).

"[T]he court's determination as to whether the department made reasonable efforts toward reunification is a legal conclusion drawn from the court's subordinate factual findings. Therefore, we apply a clearly erroneous standard of review as to the court's underlying factual findings, and we review the court's legal determinations of reasonable efforts and of failure to rehabilitate for sufficient evidence." (Internal quotation marks omitted.) *In re Quamaine K.*, 164 Conn. App. 775, 783, 137 A.3d 951, cert. denied, 321 Conn. 919, 136 A.3d 1276 (2016).

None of the respondent's arguments is persuasive. First, we observe that the department did, in fact, take steps to ensure that the children achieved a sense of permanency during the events leading up to the termination of the respondent's parental rights. It is undisputed that since the time of their removal, the children have been residing with one another and that they have been cared for by their foster parents. As the court found, since the time of their removal, the children have bonded with their foster parents and have been provided with a living environment that adequately met their physical and emotional needs. In light of the court's findings concerning the difficulties posed by the respondent in participating in the services offered to him by the department, as well as the impediments that he raised to the department's efforts to reunite the children with *both* of their biological parents, it is disingenuous for the respondent to complain that the department is to blame for the fact that the children were in foster care for a lengthy period of time.

Second, the respondent is unable to demonstrate that the department's decision to suspend overnight visits undermines the court's determination that reasonable efforts at reunification were made by the department. The court made ample findings concerning overnight

visits, none of which is distinctly challenged by the respondent. The court found that, in therapeutic settings and otherwise, each of the children had expressed their opposition to the visits. The court also found that, after discussions were had with Omar concerning overnight visits, he had bed-wetting issues for the first time in several months.[30] We are mindful, as well, that the children's opposition to overnight visits must be viewed in light of the respondent's shortcomings during unsupervised visits, which led the court to discontinue unsupervised visits. These shortcomings were thoroughly addressed by the court in its memorandum of decision. It suffices to reiterate that, at times, the respondent failed to adequately supervise and engage with the children during these visits. Moreover, the court noted the respondent's disturbing indifference to the dangers posed to Safiyah by her half brothers. In light of the facts in their totality, the respondent has failed to demonstrate that the failure to compel the children to engage in overnight visits was unreasonable or that it detracted from the court's finding that reasonable efforts had been made by the department to reunify him with his children.

Third, to the extent that the respondent attempts to undermine the court's reasonable efforts determination on the ground that the department did not place the children with a foster family of the Muslim faith, the argument is not legally sound. The court properly found that the respondent was afforded an ample opportunity to engage his children in matters of faith during his visits with them, something that he failed to do. Even if we were to assume, contrary to the evidence, that the respondent's faith, and not that of the mother, was the children's faith, a rational interpretation of § 17a-96 did not require the department to place the children with foster parents who would foster the Muslim faith in them.

For the foregoing reasons, the respondent has failed to demonstrate that the court improperly determined that reasonable efforts were made to reunify him with his children.

VII

DEPARTMENT'S SUPPORT OF CHILDREN'S
PETITIONS

Next, the respondent argues that the department was estopped from supporting the petitions brought by the children to terminate his parental rights. We decline to review this unpreserved claim.

The following relevant procedural history is reflected in the record. On November 8, 2018, the children filed petitions to terminate the respondent's parental rights. Initially, the department did not support the petitions. In a trial management conference memorandum that was submitted to the court on November 19, 2018, the

department, among other things, recommended that reunification efforts, with the mother's home as the primary physical residence of the children, continue.[31] The memorandum stated, in relevant part: "[The department] is not in support of legally severing the parents' right to reunify with their children at this time, as they have cooperated with rehabilitative efforts, have made significant progress in addressing the issues that [led] to the children's commitment, are appropriate during visitation with the children, and the children are making progress in family therapy." By the time that the trial on the petitions for termination of parental rights commenced, the department had changed its position and had adopted the children's petitions.[32]

For the first time on appeal, the respondent raises the doctrine of equitable estoppel. He argues that the department's pretrial memorandum, which he erroneously refers to as a "certificate of estoppel," was calculated to induce him to believe that he had rehabilitated. Moreover, he argues that, to his detriment, he relied on and acted on the belief that he had rehabilitated. The respondent does not provide this court with any details of how he changed his conduct or how this change in conduct was to his detriment. He states that, at the time of closing argument during the termination of parental rights trial, his trial counsel made "[a] diligent effort to find the truth on this matter . . . ."[33] The respondent states: "It is highly inequitable *and* oppressive not to estop [the department] from changing a clear position attesting that the [respondent] had rehabilitated and had made significant progress resolving all issues that [led to the] commitment, into the exact opposite [position] of adopting the [termination of parental rights] petitions." (Emphasis in original.)

"The doctrine of equitable estoppel is well established. [W]here one, by his words or actions, intentionally causes another to believe in the existence of a certain state of things, and thereby induces him to act on that belief, so as injuriously to affect his previous position, he is [precluded] from averring a different state of things as existing at the time. . . . In its general application, we have recognized that [t]here are two essential elements to an estoppel—the party must do or say something that is intended or calculated to induce another to believe in the existence of certain facts and to act upon that belief, and that the other party, influenced thereby, must actually change his position or do some act to his injury which he otherwise would not have done. . . . [T]here must generally be some intended deception in the conduct or declarations of the party to be estopped, or such gross negligence on his part as amounts to constructive fraud, by which another has been misled to his injury. . . . In the absence of prejudice, estoppel does not exist." (Citations omitted; internal quotation marks omitted.) *Gaddy* v. *Mount Vernon Fire Ins. Co.*, 192 Conn. App. 337, 351–52, 217 A.3d 1082

(2019). "The party claiming estoppel . . . has the burden of proof. . . . Whether that burden has been met is a question of fact that will not be overturned unless it is clearly erroneous." (Internal quotation marks omitted.) *Celentano* v. *Oaks Condominium Assn.*, 265 Conn. 579, 614, 830 A.2d 164 (2003).

For several reasons, we are unable to reach the merits of the respondent's estoppel claim. First and foremost, because the issue is being raised for the first time on appeal, there is no ruling by the trial court for this court to review. Moreover, the respondent has not provided this court with any legal basis on which to review this unpreserved claim. As the authority cited previously reflects, the issue of whether the doctrine of estoppel applies is inherently fact bound. Even if we were to attempt to consider the merits of the claim, one of the consequences of the respondent's failure to raise the issue at trial is that there is no evidence to review with respect to the issues of *why* the department changed its position or *whether* the respondent changed his conduct in reliance on the department's change in its position. The respondent's one-sided assertions with respect to these issues are not a substitute for an adequate evidentiary record.

VIII

MOTION TO REVOKE COMMITMENT

Finally, the respondent claims that the court improperly denied his motion for revocation of commitment. In his summary analysis of this claim, the respondent argues that, for the reasons already set forth in the context of his other claims raised on appeal, he has demonstrated that the cause underlying the children's commitment no longer exists. Specifically, he argues that he has demonstrated in this appeal that "[p]arental conflict no longer exists." The respondent's claim fails because we have rejected the other claims he has raised in this appeal. The argument that the cause underlying the commitment no longer exists is contrary to the court's findings, which, for the reasons previously discussed, we conclude are supported by the evidence and the rational inferences to be drawn therefrom. Accordingly, we reject this claim.

The judgments are affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the full names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** May 27, 2020, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The children's mother, whose parental rights also were terminated, filed a separate appeal from the judgments of the trial court; see footnote 7 of this opinion; and did not participate in this appeal. We therefore refer in this opinion to the respondent father as the respondent. During the termination of parental rights proceeding, the respondent was represented by counsel.

The respondent is appearing in a self-represented capacity in the present appeal.

[2] The respondent listed sixteen separate claims of error in the statement of the issues portion of his appellate brief. In the analysis portion of his brief, however, the respondent did not address these sixteen claims separately, but he analyzed these claims, to varying degrees, in the context of the six claims of error that we will address in this opinion.

[3] In the present action, the court, *Burgdorff, J.*, observed: "[The respondent's] final specific steps included the following: Cooperate and keep appointments with [the department] and keep the department informed of his address; undergo individual and parenting counseling and make progress toward identified treatment goals to provide a safe and stable home environment for the children, understand intimate partner violence, coercive control dynamics and how interpersonal conflict impacts children, recognize and work through coparenting conflicts, develop effective communication and healthy dispute resolution with [the] mother, and understand the children's therapeutic needs, respect [the] mother's choice of religious spirituality; accept in-home support services referred by [the department] and cooperate with them; cooperate with service providers recommended for counseling; cooperate with recommendations regarding assessment and treatment; cooperate with court-ordered evaluations and testing; sign releases to enable [the department] to communicate with service providers; sign releases for the children; get and maintain adequate housing and legal income; immediately let [the department] know about any changes in the household; cooperate with restraining/protective order and/or other appropriate safety plan approved by [the department]; keep [the] children in [the] state of Connecticut; visit [the children] as often as [the department] permits; do not get involved with [the] criminal justice system and cooperate with [the] Office of Adult Probation or parole officer and follow conditions of probation or parole; take care of the children's physical, educational, medical or emotional needs, including keeping the [children's] appointments with medical or educational providers; make all necessary child care arrangements to make sure [the children are] properly supervised and cared for by appropriate caretakers; utilize, cooperate with, and follow [the] recommendations of [the] coparenting coordinator. [The department] is to perform autism reassessment for Omar, explore/address [an] orthodontic surgery issue for Safiyah, ensure [that the] children's fears and misunderstandings surrounding [the respondent] and Islam are addressed in therapy, [and] ensure [that the] foster parents support the children's Muslim faith."

[4] On June 7, 2017, prior to the trial on the neglect petitions, the court, *Frazzini, J.*, appointed attorneys to represent each of the children. Each of the children, through his or her attorney, subsequently filed the petitions to terminate the respondent's parental rights.

General Statutes § 17a-112 (a) provides in relevant part: "In respect to any child in the custody of the Commissioner of Children and Families in accordance with section 46b-129, either the commissioner, or the attorney who represented such child in a pending or prior proceeding, or an attorney appointed by the Superior Court on its own motion, or an attorney retained by such child after attaining the age of fourteen, may petition the court for the termination of parental rights with reference to such child. . . ."

[5] General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court, upon notice and hearing as provided in sections 45a-716 and 45a-717, may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that . . . (3) . . . (B) the child (i) has been found by the Superior Court . . . to have been neglected, abused or uncared for in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

[6] The court denied the respondent's subsequent motion for articulation, noting that the court's "unambiguous findings are detailed and set forth in its decision." Later, this court granted the respondent's motion for review of the trial court's ruling but denied the relief requested therein.

[7] The mother filed a separate appeal from the trial court's judgments, which this court dismissed in October, 2019.

[8] In this appeal, the respondent has raised several claims, and they touch on not only the trial court's conduct throughout the trial but on nearly every aspect of its decision. The court had a great deal of evidence before it, and

its decision sets forth a multitude of relevant findings. This is not surprising in light of the fact that, as of the time of the trial, the children had been in the custody of the commissioner for nearly four years. In light of the nature of the claims, as well as the fact that it is necessary for this court to refer to the trial court's detailed findings of fact in our analysis, we believe that it is necessary to set forth verbatim many of the court's findings.

[9] The court found that many of the filings of the respondent "contained clear misrepresentations, falsehoods, and inconsistencies, including extremely disturbing aspersions as to [the] mother, all of which have damaged [the respondent's] credibility in [the] eyes of this court."

[10] At this point in its decision, the court set forth the following finding in a footnote: "The court does not find these conclusions persuasive based on the credible evidence presented to the court and based on Dr. Gockel's lack of independent verification of the information given to him by [the respondent]."

[11] It would serve no useful purpose to analyze each and every instance of alleged judicial bias that is discussed by the respondent in his appellate brief. Although we will discuss many of the specific points raised in the claim, in the interest of judicial economy, we may dispose of the claim by addressing some of the more prominent arguments in his brief as well as the general principles that defeat his claim. We note, however, that we have considered all of the arguments raised in his claim, and that our analysis applies to and encompasses all of the arguments raised.

[12] The respondent argues that, during the neglect proceeding, Judge Lobo did not determine "which parent was responsible for the adjudication of neglect," but that the court in the present proceeding "blamed [him] entirely." The respondent argues that the doctrine of collateral estoppel precluded the court from relitigating "the findings of prior neglect."

[13] In support of this view, the respondent observes that, at a pretrial motions hearing on January 8, 2019, during which the respondent's counsel argued that an updated evaluation of the children and an updated report from Lothstein were necessary, the court expressed its concern that the respondent was "trying to control" the situation with regard to Lothstein. The court also observed that Lothstein's prior report was based primarily on information that had been provided to him by the respondent and, thus, was "very one-sided." The record reflects that the court's observation was based on its review of matters that the parties had agreed to be marked as trial exhibits, and the court made clear that its view was based on information reflected in those exhibits.

[14] The respondent states that, before the trial started, the court indicated that it had reviewed numerous motions that he had filed and disparaged him as follows: "I saw [that the respondent] filed numerous filings with the court, numerous filings . . . . There's a lot of them in there . . . and I know a lot of them were denied. . . . I learned a lot about the case by what he filed. . . . I'm personally taking judicial notice of all the contents of the file since day [one], so counsel may . . . [refer to matters in the court file]." Thereafter, in a response to a request by Omar's counsel for the court to take judicial notice of the neglect and dissolution files, the court advised counsel to direct it to specific portions of the files. The court stated: "There's a lot of information and history . . . in these various motions that was very enlightening to the court to read and . . . I got a general idea of what the issues are in the file."

The respondent argues that, in its memorandum of decision, the court made clear that it was penalizing him for his history of bringing motions against the mother. We observe that the court's observation and its findings were based on matters properly before it, as the parties agreed that the court could review the evidence before Judge Lobo during the neglect proceeding. Moreover, the issue of the respondent's litigation history with the mother was relevant to the issue of whether the respondent had gained the ability to coparent with the mother and, thus, was one of the central issues before the court in ruling on the termination of parental rights petitions.

[15] The respondent does not provide any details of the instance during which he claims that the court "denied his request to consult with his counsel during trial . . . ." Although, in his brief, he provided a transcript citation to this alleged occurrence, the transcript does not reflect that any such request to consult with counsel was made.

[16] Part of the respondent's claim is that the court was not evenhanded in its rulings and "prevent[ed] [the respondent's] counsel from asking questions regarding the history of the case while allowing opposing parties to do the

same." The respondent has not provided relevant citations to the record to demonstrate such a pervasive pattern of rulings. It is not the role of this court to scrutinize the record of the lengthy trial in an attempt to justify this aspect of the claim.

[17] The respondent observes that, during the mother's testimony, an objection was raised with respect to questions concerning the domestic violence incident. The court stated in relevant part: "I think this question is a valid question in light of what I have to decide because I have to decide if I'm going to let these children go back to either or both parents. I need to have a good understanding of the past history with the violence. I've read some of the reports. I read the police report about what transpired in the house that day, which is very, very concerning to the court, very concerning. And, quite frankly, I think it was horrific, but I certainly think that's a valid question."

The respondent argues that this comment, as well as the court's subsequent findings in the memorandum of decision concerning his role in the domestic violence incident reflects that Judge Burgdorff deemed him guilty of having committed "a horrific crime" and, thus, she "should have recused herself." The respondent argues that such findings are "starkly inconsistent" with Judge Lobo's findings in the neglect proceeding. It suffices to observe that the court heard ample evidence that the respondent engaged in domestic violence by having entered the family home against the mother's wishes on July 29, 2015, and having forced himself into the mother's locked bedroom. Thus, the court's comment in ruling on the objection and its later findings were properly based on evidence before the court and the reasonable inferences to be drawn therefrom.

[18] In his decision adjudicating the children neglected, Judge Lobo stated in relevant part: "One of two things happened [during the alleged domestic violence incident]. Either [the respondent] forcibly assaulted [the mother] or the assault didn't happen, and [the mother] cut herself and exposed the children to her state afterward, in which she's described as being covered in blood by the children. . . . That they were arguing and yelling . . . the court finds that . . . most likely credible. Either one of those two things occurred. And the court really doesn't need to determine which one it is because [the resolution of the neglect petitions] comes down to the condition of the children at the time of the filing of the petitions."

[19] We observe that, at trial, the court explicitly afforded the respondent's counsel an opportunity to present live testimony from Lothstein. The respondent's counsel, however, indicated his preference to introduce a transcript of Lothstein's testimony at a prior proceeding as well as a report Lothstein authored.

[20] As is reflected in the court's memorandum of decision, the court noted that it had considered the respondent's failure to rehabilitate during the four years since the children's removal from the family home.

[21] The record reflects that, on August 7, 2015, following the ten day hearing on the order of temporary custody, the respondent was provided with and signed a document containing the preliminary specific steps he needed to take to promote his rehabilitation and reunification with the children. One of the steps required the respondent to "[c]ooperate with service providers recommended" by the department. Although, prior to the trial on the neglect petitions, the respondent engaged in some recommended services, Judge Lobo found it noteworthy, in light of the unique coparenting failings that contributed significantly to the children's removal from the family home, that the respondent had not engaged in the services of a parenting coordinator. A department social study filed prior to the neglect trial referred to the fact that, when he was "re-referred" to meet with a parenting coordinator, he deemed such services to be unnecessary. Additionally, Judge Lobo, in ruling on the neglect petitions, observed in relevant part: "[The respondent] feels that his one day family course was enough to not need a parenting coordinator. The court will note that a one day parenting course in family court does not equal working with a parenting coordinator over a period of time. [The respondent] opined that the system itself is at fault regarding the children's prolonged presence in foster care and . . . testified that any controlling and coercive behavior in the past can be interpreted in different ways. During the course of the testimony and the course of the questioning, and [as is reflected in the documentary evidence presented, the respondent] feels that he in no way, shape or form owns anything as to the reason for the children's removal."

[22] As the commissioner states in her brief, § 17a-112 (j) (3) (B) (ii) provides that, in certain circumstances, a petition that is based on a failure to rehabili-

tate may be adjudicated even in the *absence* of a finding of neglect and, pursuant to General Statutes § 46b-129 (b), upon the issuance of an ex parte order, the court must provide "specific steps" to each parent to address the ex parte order and to regain custody of his or her child.

[23] The respondent also argues that the court committed legal error by considering "[w]hat happened between [him] and the mother during their marriage" because "those issues ceased to exist after the date [that the court issued specific steps]." The respondent's argument completely ignores the fact that, to determine whether he had rehabilitated, it was necessary for the court to understand the scope of the problems, particularly the issues involving coparenting, that led to the children's removal from the family home and their ultimate adjudication as neglected children.

[24] We take judicial notice of the fact that, in October, 2018, shortly before the termination of parental rights trial commenced, the respondent filed a motion to open the judgment dissolving his marriage to the mother. In an appeal from the denial of that motion, the respondent, referring to the domestic violence incident at the marital home, argued that the mother had perpetrated "a criminal fabrication of a bloody assault . . . ."

[25] The court had before it proposed orders that were filed by the respondent in the dissolution action in May, 2016. One of the orders he proposed was that the respondent "shall reserve the right to file a postjudgment motion in family court for a final ruling on custody of the three children." Thus, despite the fact that the family court had deferred a decision on the issue of custody and visitation to the juvenile court, the respondent remained intent on continuing the custody battle if the decision of the juvenile court was not to his satisfaction. This action reflects his lack of insight into the children's need for stability and his self-absorbed determination to get his own way.

[26] General Statutes § 45a-707 (8), defines "[t]ermination of parental rights" as "the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and the child's parent or parents so that the child is free for adoption except it shall not affect the right of inheritance of the child or the religious affiliation of the child."

[27] The respondent erroneously suggests that § 45a-707 (8) sets forth such a requirement. We observe that General Statutes § 46b-129 expresses a legislative *preference*, rather than an *obligation*, that, during a commitment following a finding of neglect, the commissioner place children entrusted to his or her care in an environment that is consistent with the religious faith of the child or parent.

General Statutes § 46b-129 (j) (4) provides in relevant part: "In placing such child or youth, the commissioner shall, *if possible*, select a home, agency, institution or person of like religious faith to that of a parent of such child or youth, if such faith is known or may be ascertained by reasonable inquiry, provided such home conforms to the standards of the commissioner and the commissioner shall, when placing siblings, if possible, place such children together. . . ." (Emphasis added.)

We note that, in the present case, the department complied with the preference codified in § 46b-129, in that it accomplished the very difficult task of placing three siblings with highly specialized needs together in the same foster home of a nonrelative and that, at the time of the trial, the placement had remained stable for almost four years.

[28] In the context of his analysis of this claim, the respondent focused on the issue of religion. At the conclusion of his analysis, however, the respondent stated in general terms that "[n]o . . . proof was presented during trial to support a finding that placement with the [respondent] is not in the children's best interests." This cursory statement, unsupported by legal analysis or reference to the record, may be an attempt to challenge the court's detailed findings in the dispositional phase of the proceeding, yet it is legally insufficient. "[W]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.) *Ward* v. *Greene*, 267 Conn. 539, 546, 839 A.2d 1259 (2004). Accordingly, we do not address in further detail this aspect of the claim.

[29] General Statutes § 17a-96 provides in relevant part: "In placing any child in a foster home, the commissioner shall, *if practicable*, select a home of like religious faith to that of the parent or parents of such child, if such faith is known or ascertainable by the exercise of reasonable care." (Emphasis added.)

[30] The record reflects that, at the time of the neglect proceeding, Omar

began expressing his desire not to have visits with the respondent. The respondent states in his brief to this court that, at the time of the court's judgments in the neglect proceeding, Judge Lobo required the department to address the issue in therapy. In addition to stating that Omar's opposition to visits was an issue to be addressed "in therapy to work that out," Judge Lobo also stated: "If [Omar] doesn't want to visit, I'm not going to force him to visit." Contrary to the respondent's suggestion that the department failed to comply with Judge Lobo's directive that the children be enrolled in therapy, the evidence reflected that all three children were in therapy soon after the neglect proceeding took place.

[31] In the memorandum, the department also disagreed with the respondent's motion for revocation of commitment, observing that reunification must "be based upon a slow transition, whereby the children become more confident in their parents' ability to safely coparent them, and display a significant reduction or elimination of regressive behaviors and emotional distress in relation to the specter of reunification."

[32] By the time of the termination of parental rights trial, the children had been in the custody of the commissioner for nearly four years.

Relevant statutes prohibit, except in limited circumstances, the type of lengthy stays in foster care that the children in the present case were forced to endure.

General Statutes § 17a-111a provides in relevant part: "(a) The Commissioner of Children and Families shall file a petition to terminate parental rights pursuant to section 17a-112 if (1) the child has been in the custody of the commissioner *for at least fifteen consecutive months*, or at least fifteen months during the twenty-two months, immediately preceding the filing of such petition  . . . .

"(b) Notwithstanding the provisions of subsection (a) of this section, the commissioner is not required to file a petition to terminate parental rights in such cases if the commissioner determines that: (1) The child has been placed under the care of a relative of such child; (2) there is a compelling reason to believe that filing such petition is not in the best interests of the child; or (3) the parent has not been offered the services contained in the permanency plan to reunify the parent with the child or such services were not available, unless a court has determined that efforts to reunify the parent with the child are not required." (Emphasis added.) See also 45 C.F.R. § 1356.21, which sets forth, inter alia, federal guidelines for concurrent planning and family reunification with regard to children placed in foster care.

The record reflects that, until nearly the eve of trial, the commissioner proposed permanency plans that sought to further *reunification* efforts while the children continued to languish in foster care. For example, in April, 2017, the commissioner filed motions to review permanency plans in which she proposed that reunification of the children with their biological parents was in their best interests. In support of these plans, the commissioner filed a social study that was completed by the department and recommended reunification with a period of protective supervision. Safiyah objected to her permanency plan on the grounds that she had bonded with her foster family, she preferred to live with her foster family, she was "adamant about not living" with either of her biological parents, and it was in her best interests to remain with her foster family. Omar also objected to his permanency plan. The respondent objected to this plan on, inter alia, the ground that the mother was not seeking custody of the children and was not a fit parent. In September, 2017, the court, *Frazzini, J.*, approved these plans and ordered the commissioner to file subsequently required motions to review the permanency plans on or before June 7, 2018.

In June, 2018, despite the passage of nine more months during which the goal of reunification with either parent still had not been achieved, the commissioner filed motions to review the permanency plans in which she continued to propose that reunification of the children with their biological parents was in their best interests. In support of these plans, the commissioner submitted a social study that was completed by the department and recommended reunification with the mother, with a period of protective supervision, prior to the start of the 2018–2019 school year. The children and the respondent objected to these plans. Safiyah and Muneer based their objection, in part, on their desire not to live with either biological parent and their desire to continue to live with their foster parents. Omar objected to his plan, as well. It is not clear from the record whether the court approved the permanency plans that were filed in June, 2018, despite the fact that the law requires approval of a permanency plan every twelve months when

children remain in the custody and care of the commissioner. See General Statutes § 46b-129 (k) (1) (A).

In light of the undisputed facts concerning the length of time that the children were in the custody of the commissioner and living uninterrupted in foster care, in the permanency plans we have discussed, which were pursued in 2017 and 2018, the commissioner was required by law to set forth a compelling reason to believe that filing petitions to terminate the parental rights of the respondent and the mother was not in the best interests of the children because the children had been in care for more than fifteen months. The commissioner did not do so.

There is no dispute that the children were never placed in the care of a relative or that the respondent and the mother had been offered the services referred to in the plan to reunify. In fact, every time that the court approved a permanency plan in this case, it found that the department had made reasonable efforts at reunification. When the commissioner filed the motions to review the permanency plans at issue, she did not, by means of either her motions or the social studies that were filed in support of the motions, advance a compelling reason to support the belief that petitions to terminate the parental rights of the respondent and the mother were not in the best interests of the children. Moreover, with respect to the permanency plan that the commissioner filed in 2017, the court approved the plan over the objections of the children, who, as they did at the time of trial, adamantly believed that it was in their best interests to terminate the parental rights of the respondent and the mother.

General Statutes § 46b-129 (k) (4) provides: "At a permanency hearing held in accordance with the provisions of subdivision (1) of this subsection, the court shall (A) (i) ask the child or youth about his or her desired permanency outcome, or (ii) if the child or youth is unavailable to appear at such hearing, require the attorney for the child or youth to consult with the child or youth regarding the child's or youth's desired permanency outcome and report the same to the court, (B) review the status of the child or youth, (C) review the progress being made to implement the permanency plan, (D) determine a timetable for attaining the permanency plan, (E) determine the services to be provided to the parent if the court approves a permanency plan of reunification and the timetable for such services, and (F) determine whether the commissioner has made reasonable efforts to achieve the permanency plan. The court may revoke commitment if a cause for commitment no longer exists and it is in the best interests of the child or youth."

It does not appear that the court, when it approved the permanency plans in September, 2017, despite the fact that the children had by then been in foster care for more than two years, established a time table or modified the specific steps to ensure permanency would be achieved before the approval of another permanency plan would be required. The result was another lengthy delay during which permanency in the lives of the children was not achieved while the divorced parents remained in a holding pattern of participating in services but not benefiting sufficiently such that one of them could be reunified with the children.

Thus, setting aside the concerns raised by the respondent in the present claim, it appears that, after the children had been in foster care beyond fifteen months, the commissioner, by continuing to recommend plans for reunification without setting forth a compelling reason to do so, did not comply with her obligations under General Statutes § 17-111a to file petitions to terminate the respondent's parental rights with respect to these children. Filing for termination of parental rights thus became an option the children had to undertake for themselves. Child-initiated petitions are an extremely rare occurrence in the law of child protection.

[33] The respondent draws our attention to the fact that, during closing argument, his counsel referred to the department's decision, at the time of trial, to support the petitions as a "mystery."